UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KADANT JOHNSON INC.,
    Plaintiff,

versus

JOSEPH V. D'AMICO, ET AL.
    Defendants.

)
) Civil Action
) File No. 10-cv-02869
)    c/w No. 11-cv-0036
)
) (PERTAINS TO 10-CV-02869)
)
) Judge Helen G. Berrigan
)
) Magistrate Judge Joseph C. Wilkinson, Jr.
)

## PLAINTIFF'S THIRD SUPPLEMENTAL AND AMENDING COMPLAINT

Plaintiff's original Verified Complaint and Application for Preliminary and Permanent Injunction, First Supplemental Complaint, and Second Supplemental Complaint (hereinafter collectively referred to as "Complaint") are hereby supplemented as follows:

### 129.

All averments, allegations, assertions and representations contained in Plaintiff's Complaint are incorporated in this Third Supplemental Complaint, as if repeated herein *in extenso*.

### ADDITIONAL DEFENDANT

### 130.

Plaintiff supplements and amends its Complaint to name Fictitious Party Defendant 1 as Utility Optimization Group, Inc., also known as Utility Construction Group, Inc. (hereafter, when referring to either or both, "UCG"), a corporation doing business and incorporated in the State of Mississippi. UCG may be served through its registered agent, CT Corporation System, 631 Lakeland East Drive; Flowood, MS 39232. UCG is a part of the/are "D'Amico Controlled Entities" as defined in the August 6, 1999 Non Compete Agreement.

## SUPPLEMENTAL FACTUAL ALLEGATIONS

131.

Plaintiff supplements and amends its Complaint to identify Texas Steam and Instrumentation Co., Inc., Texas Steam Equipment, LSE Systems, Inc., and T.C. Broome Construction Company, L.L.C. as additional "D'Amico Controlled Entities", as defined in the August 6, 1999 Non Compete Agreement.

132.

Defendant Utility Optimization Group, L.L.C. is also known as Utilities Optimization Group, L.L.C.

133.

Defendants, Joseph V. D'Amico, III; Louisiana Steam Equipment, L.L.C.; Utility Optimization Group, L.L.C., also known as Utilities Optimization Group, L.L.C.; Utility Optimization Group, Inc., also known as Utility Construction Group, Inc. (hereinafter collectively referred to as "Defendants"), solicited Kadant Johnson customers at trade shows and at other times, despite the provisions prohibiting them from doing the same in the August 6, 1999 Non-Disclosure, Non-Competition, and Non-Solicitation Agreement ("Non-Disclosure Agreement") in place between the parties to this action, and previously referenced in Plaintiff's Complaint.

134.

These unlawful solicitations to Kadant Johnson customers included representations by Defendants that the PTS9750 rotary joint and component parts manufactured by a competitor of Plaintiff are compatible with Plaintiff's PTX9750 rotary joint and component parts, among other solicitations in violation of the August 6, 1999 Non-Disclosure Agreement. Defendants made

2

these false representations regarding Plaintiff's PTX9750 rotary joint and component parts at the Technical Association for the Pulp and Paper Industry to at least 50-75 Kadant Johnson customers, among other occasions. Defendants also stated in their December 2009 solicitation, entitled "Announcement to All of Our Valued Pulp and Paper Industry Clients" and distributed to Defendants' and Plaintiff's customers, that they "can now provide OEM and alternatively sourced paper industry equipment and component parts based upon the best value to our clients."

135.

Other unlawful solicitations included the use of copyright- and trademark-protected materials belonging to Kadant Johnson in a presentation entitled "Opportunities in Paper Machine Efficiency Improvement." This presentation was used to wrongfully solicit Kadant Johnson customers in sales and marketing pitches on at least thirty (30) separate occasions, among other solicitations in violation of the August 6, 1999 Non-Disclosure Agreement.

136.

On information and belief, as evidence of pattern and practice, Defendants as representatives of other manufacturers, have attempted to use non-OEM components in the manufacturer's OEM-only parts.

137.

Among some of the Kadant Johnson customers Defendants did knowingly solicit in violation of the August 6, 1999 Non-Disclosure Agreement are Georgia Pacific Brewton, Boise Jackson, Boise DeRidder, IP Cantonment, IP Campti, Smurfit Panama City, Smurfit Jacksonville, Smurfit Stone Fernandina Beach, Mobile Paperboard, Kimberly Clark, and West-Linn Paper Company.

138.

Defendants have purchased "equipment from foreign competitors by Defendants for resale…[for] sales of parts in competition with Kadant parts" at least at the following locations: Georgia Pacific Brewton, International Paper Mansfield, International Paper Cantonment, International Paper Campti, Graphic Packaging (unspecified location), Georgia Pacific Zachary, Georgia Pacific Pennington, Boise Cascade Jackson, and Boise Cascade DeRidder.

139.

Among others, on information and belief, Defendants have made competing sales or offers to sell to at least 177 customers of Plaintiff, including International Paper Mansfield (including non-Kadant Johnson O-Rings and gaskets), Graphic Packaging West Monroe (including non-Kadant Johnson O-Rings, seal rings, and gaskets), Rock-Tenn Hodge, Temple Inland Bogalusa, Coastal Paper (Cellu Tissue) Wiggens (including a complete siphon assembly, a syphon shoe, dryer bars, Defendants using Plaintiff' trademark name of "Turbulator" without credit, replacement parts for Plaintiff's PTX rotary joint, and Defendants providing the mill with Plaintiff's drawings), Valentine Chemical Lockport, and Georgia Pacific Camas.

140.

At KPAQ St. Francisville, Defendants used Plaintiff's product model numbers, part identification numbers, their past association with Plaintiff to prepare quotations and receive orders, and deliver non-Kadant Johnson products. Plaintiff had provided in June 2009 to Defendant D'Amico an Equipment Sizing Assessment of the #1 PM at KPAQ St. Francisville. On information and belief, those recommendations were used by Defendants to support a sale of competing parts.

141.

At Superior Fabricators Baldwin, the company requested and received a quote in November 2010 from Defendant LSE for Kadant Johnson "Type-S" steam joints, even though LSE had not been a representative of Plaintiff for over a year. Superior Fabricators ordered two steam joints and related hardware from Defendants through Defendants' employee, Tim DeFrance. In connection with LSE's sale or offer to sell at Superior Fabricators, Defendants sent Superior Fabricators several of Plaintiff's confidential and proprietary drawings (including AB3990 and AB4118), although Defendants removed and deleted the title block, drawing number, and the note "This drawing is the property of the Johnson Corporation" in an attempt to pass the drawings off as Defendants'.

142.

Following the termination of the 1993 Manufacturer's Agent Agreements in place between Kadant Johnson and Defendants, Defendants and the "D'Amico Controlled Entities" did knowingly sell Kadant Johnson and/or imitation Kadant Johnson parts and equipment to Defendant Louisiana Steam Equipment, L.L.C., now a competitor of Kadant Johnson. The August 6, 1999 Non-Disclosure Agreement prohibits Defendants and the "D'Amico Controlled Entities" from selling competitive parts to Kadant Johnson customers; Louisiana Steam Equipment, L.L.C. was a customer of Plaintiff following the termination of the 1993 Manufacturer's Agent Agreement. Accordingly, these sales represent additional violations of the August 6, 1999 Non-Disclosure Agreement.

143.

Additionally, Louisiana Steam Equipment, L.L.C. did knowingly buy parts from the other Defendants and "D'Amico Controlled Entities" that it knew competed with Kadant Johnson parts.

144.

Defendants and the "D'Amico Controlled Entities" did obtain and had access to Plaintiff's confidential and proprietary price lists and sheets, including its 2007 and 2010 Master Price Lists. On information and belief, Defendants used these price lists and sheets, and with knowledge of Plaintiff's prices, to undercut Plaintiff in the market by offering discounts off Kadant Johnson's list prices.

145.

In the course of their unlawful solicitations, Defendants have used and continue to use copyright- and trademark-protected materials belonging to Kadant Johnson. Plaintiff has on numerous occasions requested the return of these materials, yet Defendants persist in retaining and misusing proprietary Kadant Johnson images, drawings, and other documents.

146.

Plaintiff also contends that as a result of Defendants' joint venture with Plaintiff, Defendant received "site keys" allowing them access to Plaintiff's other computer systems for the period from 1997 to 2006.

147.

Defendants would thus have had access to Plaintiff's confidential and proprietary information through at least the following Johnson Southeast employees for the specified time periods: John Eklund (who has access during 2004-2005 to Lotus Notes emails); Bob Watson (who had access during 2000-2004 to Lotus Notes emails); John Murphy (who had access during 2000-2003 to Lotus Notes emails); David Mather (who had access during 2003-2005 to Lotus Notes emails); and Jim Patterson (who had access during 2004-2006 to Lotus Notes emails). Some of these employees accessed drawings over this time period.

148.

Defendants obtained access to Plaintiff's confidential and proprietary information by virtue of Defendants' association with the joint venture. The foregoing employees would have facilitated any inquiries from Defendants or its employees.

149.

There were various levels of access to Lotus Notes that Defendants' employees would have had to each database: "author access" (the user can create and edit his documents); "editor access" (the user can edit any document); and "read access" (the user can only read the documents and cannot make any changes to the documents).

150.

LSE employees had access to data and were able to enter customer orders directly through Visual Manufacturing; for instance, an "Acknowledgment" form would show by initial which LSE employees entered an order, the customer name, the items purchased, Plaintiff's part numbers, part descriptions, terms of sale, and associated prices.

151.

Plaintiff also sent Defendants (including Joseph V. D'Amico) at least the following "New Product Information" (NPI) packages to support the sale of Plaintiff's product and service offerings: (a) 5750SBAF, Self-Supporting Rotary Joint with Cantilever Stationary Syphon (ship date of January 15, 1999); SA3V-1000, Liqui-Mover Replacement Float Mechanism for Competitor Pressure Powered Pumps (ship date of December 30, 1998); Corr-Pro, Rotary Joint and Syphon System for Corrugating Machine (ship date of December 30, 1999); Beloit CS Upgrade, Johnson Upgrade Kit for Beloit CS Joints (ship date of August 23, 2000); PTX, PTX Rotary Joint and Syphon System (ship date of November 15, 2000); R&D Center, Johnson R&D

Center (ship date of December 20, 2001); Spring-Lock Elbow, Spring-Lock 60° Syphon Elbow (ship date of January 23, 2002); Large WRX, 4400WRX Rotary Joint (ship date of March 25, 2002); Turbulator® Bars (ship date of May 17, 2002); Scoop Syphon (ship date of July 22, 2002); 2500L5JA-PT Rotary Joint (ship date of August 30, 2002); SX Rotary Joint (ship date of February 17, 2003); De-Tuned Turbulator® TubeTM Bars (ship date of March 7, 2003); Medium Speed Stationary Syphon (ship date of December 1, 2003); ELSN Nipple Conversion (ship date of December 18, 2003); 2-3" WRX Joint (ship date of August 13, 2004); WH Joint (ship date of March 7, 2005); 9700 PT Joint (ship date of March 17, 2006); Internally Supported Stationary Syphon (ship date of March 31, 2007); High-Efficiency Thermocompressor (ship date of September 26, 2007); Large ELS Rotary Joint (ship date of December 17, 2007); RX Rotary Unions (ship date of February 1, 2008); OTS Rotary Union (ship date of March 3, 2008); 45° Locking Syphon Elbow (ship date of May 19, 2008); Yankee Dryer Turbulator® Tube™ Bars (ship date of July 20, 2008); and SNX Rotary Joint (ship date of April 28, 2009). All NPIs are marked as confidential.

152.

In addition, Defendants obtained access to Plaintiff's personnel and obtained "Confidential Proprietary Information" and/or trade secrets through their contacts with Kadant Johnson through the joint venture. Defendant D'Amico, for instance, had access to Ken Hill, Alan Ives, and Jeff Chaloux and discussed confidential or proprietary information with these individuals related to drying technology, Plaintiff's programs estimating diverted motive steam volume, calculations, and Plaintiff's rotary joint. Defendant D'Amico used Plaintiff's employee, Jeff Chaloux, because the "Kadant Johnson program is the most accurate basis for estimating the diverted motive steam volume".

8

153.

Defendants received drawings of Plaintiff marked as "confidential" or the "property of" Plaintiff. For instance, Defendants had copies of several of Plaintiff's confidential and proprietary L.E. and A.B. drawings, which were expressly referenced in Defendant's January 16, 2011 letter signed by Joseph Canale and sent to Larry LeBlanc at International Paper Campti. Defendants disseminated, or attempted to do so, at least the following of Plaintiff's confidential and proprietary drawings: LE1596, AB8680, AB8681, LE1570, LE1861, LE1862, LE1863, AB8502, and AB8503.

154.

On Plaintiff's information and belief, Defendants provided the Coastal Paper (Cellu Tissue) Wiggens facility with a copy of Plaintiff's assembly drawing (AB8465) for the 9750PTX rotary joint, drawing AB9317, and a confidential Bill of Material; all drawings are marked "property of" Plaintiff and "confidential". These drawings were provided during the effective date of Plaintiff's patent. On further information and belief, Defendants solicited or attempted to sell competing parts to Coast Paper (Cellu Tissue) Wiggens in October 2010, on a date after the termination of the Manufacturer's Agents Agreement and the joint venture.

155.

Furthermore, Defendant D'Amico and Defendants' employees (Joe Canale, Sam Canatella, John Conley, Ann Foreman, Todd Martin, Chris Norris, Wes Sorrells, and Robert Watson) had access to Plaintiff's intranet system and the confidential information contained therein.

156.

In Defendants' Steam Electrical Balance Project Offering presentation, the top slide is taken from a study that Plaintiff's employees created using Plaintiff's syphon sizing software. Some of the other slides were taken from Plaintiff's Boise Deridder PM1 machine study in 2004. Defendant D'Amico attended a presentation conducted by Ken Hill, and Defendant D'Amico would have obtained a copy of that presentation that contained materials that made their way into Defendants' presentations. In addition, slides were taken from Ken Hill's presentation on Thermocompressors, which was used in a December 2006 regional optimization clinic and in regional seminars.

### 157.

Defendants also consciously used Kadant Johnson part numbers, Kadant Johnson symbol numbers and part descriptions, and Kadant Johnson's pricing. On information and belief in PM#1, International Paper Campti had installed a Kadant Johnson steam joint, but the nipple assembly would not fit properly with the Kadant Johnson end cap. The nipple assembly was a part manufactured by Defendants.

### 158.

In addition, LSE used the Kadant Johnson common law trademark "Type-S Rotary Joint", the Kadant Johnson size designation "3700", the Kadant Johnson part number 16B92300 with a "U" in front of it, and the Kadant Johnson "Super-B" designation for special plating. Plaintiff contends that these acts of Defendants constitute malice under the law, and provide clear evidence of unfair, misleading, and deceptive trade practices, breach of the agreements at issue in this case, and infringements of Kadant Johnson trademarks.

### 159.

In addition, Defendants have purchased rotary joints from the Shanghai Jinxuan Rotary Joint Making Company, and other rotary joint manufacturers, despite knowing of the existence and validity of the non-solicitation, non-disclosure, and non-competition provisions at issue in this case, in direct competition with Plaintiff.

160.

On information and belief, Defendants have also channeled their competing parts through Fulton Steam Systems and E.S. Constant, both of whom have in turn supplied competing parts, steam systems, and thermocompressors to customers.

161.

The August 6, 1999 Non-Disclosure Agreement contains a provision entitled "Article Seven – Acknowledgement of Reasonableness" which reads as follows:

> 7.1   The parties hereto agree and acknowledge that the covenants contained in Articles Three, Four, and Five are, taken as a whole, reasonable in their scope and duration. Each party further agrees that the reasonableness of the scope and duration of any such covenants shall not be contested in any proceeding to enforce the covenants.

162.

The August 6, 1999 Non-Disclosure Agreement contains a provision entitled "Article Eight – General Provisions" which includes the pertinent provisions 8.3 and 8.4, which read as follows:

> 8.3   This Agreement, the rights and obligations of the parties hereto, and any claim or dispute hereunder, will be governed by and construed in accordance with the laws of the State of Michigan, without regard to its choice of law provisions.
>
> 8.4   Any provision of this Agreement which in any way contravenes any applicable law, statute, ordinance, regulation or common law theory, or is otherwise unenforceable in any

11

jurisdiction, shall be reformed to the extent required to render the Agreement enforceable... .

## SUPPLEMENTAL CLAIMS FOR BREACH OF CONTRACT

163.

Plaintiff now brings these additional claims for breach of contract.

## SUPPLEMENTAL COUNT FOR BREACH OF CONTRACT (ALL DEFENDANTS)

164.

Plaintiff hereby realleges and incorporates the allegations set forth in its Complaint and in paragraphs 129 to 163 above as though specifically set forth herein.

165.

The actions of Defendants described in paragraphs 129 to 163 of this Third Supplemental Complaint, as well as those in Plaintiff's Complaint, represent violations of Article 5 of the August 6, 1999 Non-Disclosure Agreement, which provides in pertinent part:

> a) Neither D'AMICO nor any D'AMICO CONTROLLED ENTITY will take any action or make any public statement with the intent or having the probable effect of degrading the good name or business interests of JOHNSON, or any of its subsidiaries or affiliated companies, including the REGIONAL CENTER....
>
> b) Neither D'AMICO nor any D'AMICO CONTROLLED ENTITY will discuss with any Existing Customer or Potential Customer of either JOHNSON or the REGIONAL CENTER, the present or future availability of products or services of a business, if D'AMICO or a D'AMICO CONTROLLED ENTITY has or expects to acquire a proprietary interest in such business, or is or expects to be an employee, agent, officer, director, partner or member of such business, and such products or services of the business are competitive with the JOHNSON's joint, syphon, and steam drying technology, the Johnson Diagnosys Inc. technology or the Cavallini technology (advanced controls) or any technology which D'AMICO or D'AMICO CONTROLLED ENTITIES knows or reasonably believes JOHNSON, Johnson Diagnosys Inc. or Cavallini (advanced controls) plan to provide in the future.

c) Neither D'AMICO nor any D'AMICO CONTROLLED ENTITY will (i) knowingly make any statement or do any act intended to cause any Existing Customer or Potential Customer of JOHNSON or the REGIONAL CENTER to purchase the products or make use of the services of any business in which D'AMICO or any D'AMICO CONTROLLED ENTITY has or expects to acquire a proprietary interest or in which D'AMICO is or expects to be made an employee, officer, partner, member, or director, and (ii) if sought out or contacted by an Existing Customer or Potential Customer will not provide products or render services to such Existing Customer or Potential Customer, if such products or services in any way relate to or arise out of JOHNSON's joint, syphon, and steam drying technology, Johnson Diagnosys Inc. technology or the Cavallini technology (advanced controls) or compete with JOHNSON's joint, syphon, and steam drying technology, the JOHNSON Diagnosys Inc. technology or the Cavallini technology (advanced controls).

166.

Article 5 of the August 6, 1999 Non-Disclosure Agreement further defines "Existing Customer" and "Potential Customer" as follows:

> For purposes of this section, the term "Existing Customer" shall mean a person or entity who is a customer of JOHNSON or the REGIONAL CENTER (and, with respect to any other entity of The Johnson Corporation organization, of which D'AMICO knows or has been or is thereafter advised) at the time of the termination of all agreements between JOHNSON or any other entity of The Johnson Corporation organization, including the REGIONAL CENTER, and D'AMICO or any D'AMICO CONTROLLED ENTITY. The term "potential Customer" shall mean a person or entity who was the target of sales or marketing activity either by JOHNSON or the REGIONAL CENTER during the twelve (12) month period immediately preceding the termination of all agreements between JOHNSON or any other entity of The Johnson Corporation organization, including the REGIONAL CENTER, and D'AMICO or any D'AMICO CONTROLLED ENTITY.

167.

Defendants have violated Article 5 of the August 6, 1999 Non-Disclosure Agreement by soliciting Kadant Johnson customers.

168.

Defendants have breached Article 7.1 of the August 6, 1999 Non-Disclosure Agreement by contesting the reasonableness of the covenants contained in Articles Three, Four, and Five.

169.

Defendants have breached Article 8.3 of the August 6, 1999 Non-Disclosure Agreement by contending that the contract should be governed by some State law other than Michigan.

170.

Plaintiff has suffered and continues to suffer damages as a result of Defendants' unlawful violation of Article 5 of the August, 6, 1999 Non-Disclosure Agreement.

## SUPPLEMENTAL COUNT FOR BREACH OF CONTRACT – NON-COMPETITION (ALL DEFENDANTS)

171.

Plaintiff hereby realleges and incorporates the allegations set forth in its Complaint and in paragraphs 129 to 163 above as though specifically set forth herein.

172.

The actions of Defendants described in paragraphs 129 to 163 of this Third Supplemental Complaint, as well as those in Plaintiff's Complaint, represent violations of the Non-Competition provision of the August 6, 1999 Non-Disclosure Agreement, contained therein as Article 4.

173.

Plaintiff has suffered and continues to suffer damages as a result of Defendants' unlawful violation of Article 4 of the August, 6, 1999 Non-Disclosure Agreement.

## PRAYER FOR RELIEF

Kadant Johnson hereby incorporates the Prayer for Relief in its Complaint as though specifically prayed herein, and supplements it by praying for further relief:

1) Two-hundred and fifty-thousand dollars ($250,000.00) for each breach by Defendant Joseph V. D'Amico, III, of the August 6, 1999 Non-Disclosure, Non-Competition & Non-Solicitation Agreement;

2) Two-hundred and fifty-thousand dollars ($250,000.00) for each breach by Louisiana Steam Equipment, L.L.C., of the August 6, 1999 Non-Disclosure, Non-Competition & Non-Solicitation Agreement;

3) Two-hundred and fifty-thousand dollars ($250,000.00) for each breach by Utility Optimization Group, L.L.C., also known as Utilities Optimization Group, L.L.C., of the August 6, 1999 Non-Disclosure, Non-Competition & Non-Solicitation Agreement;

4) Two-hundred and fifty-thousand dollars ($250,000.00) for each breach by Utility Optimization Group, Inc., also known as Utility Construction Group, Inc., of the August 6, 1999 Non-Disclosure, Non-Competition & Non-Solicitation Agreement;

5) Declaratory relief determining that the right and obligations of the parties hereto, and any claim filed hereunder, are governed by and construed in accordance with the law of Michigan, without regard to its choice of law provisions;

6) Reformation of any provision of this Agreement which may be deemed to in any way contravene any applicable law, statute, ordinance, regulation or common law theory, or is otherwise unenforceable in any jurisdiction, as provided by Article 8.4 of the August 6, 1999 Non-Disclosure, Non-Competition & Non-Solicitation Agreement; and

7) Such other and different relief as justice or the August 6, 1999 Non-Disclosure, Non-Competition & Non-Solicitation Agreement may require or provide for, including but not limited to an award of costs, attorney's fees and expenses.

Respectfully submitted,

_/s/ Mark N. Mallery_
Mark N. Mallery, T.A., La. Bar No. 17666
Paul S. Balanon, La. Bar No. 29076
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
639 Loyola Avenue, Suite 2550
New Orleans, Louisiana 70113
Telephone: (504) 648-3840
Facsimile: (504) 648-3859

Attorneys for Kadant Johnson Inc.

## LR7.6E CERTIFICATE OF OPPOSITION

Pursuant to LR7.6E, I hereby certify that I have met with opposing counsel, who has stated that they oppose the filing of this Third Supplemental and Amending Complaint.

On this 18th day of October, 2011.

/s/ Mark N. Mallery

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been filed via the Court's Electronic Case Filing System, which provides for service on all counsel or record.

On this 18th day of October, 2011.

/s/ Mark N. Mallery

11089091.1 (OGLETREE)