UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **KADANT JOHNSON, INC.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 10-2869**<br>***Pertains only to 11-36*** |
| **JOSEPH V. D'AMICO, LOUISIANA STEAM EQUIPMENT, LLC and UTILITIES OPTIMIZATION GROUP, LLC** | **SECTION "C" (2)** |

ORDER & REASONS

On October 5, 2011, the Court held a claim construction hearing to define the claims of U.S. Patent No. 5,098,135 ('135) entitled "Rotary Joint With Axial Compensation"("rotary joint" or "'135 Patent") pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995). Based on arguments and evidence presented at the hearing, the memoranda of the parties, the facts, and the record in this case, the Court finds the definitions of the claims at issue as follows.


I. BACKGROUND

A. Procedural History

As stated in the Court's January 9, 2012 Order, this case comprises claims from two consolidated lawsuits.  On June 21, 2010, Plaintiff filed his first suit in Alabama state court against Joseph V. D'Amico ("D'Amico"), Louisiana Steam Equipment, LLC ("LSE"), Utilities Optimization Group ("UO Group"), and affiliated companies, alleging breach of contract.  (Rec. Doc. 1-8).  The case was removed on the basis of diversity jurisdiction, 28 U.S.C. § 1332, to the

Middle District of Alabama on July 6, 2010.  (Rec. Doc. 1-2).  The suit was transferred to this Court and captioned 10-2869.  (Rec. Doc. 5).  On September 8, 2010, Defendants filed a Counterclaim demanding declaratory judgment concerning portions of the four contracts Defendants entered into with Plaintiff between 1993 and 2006.  (Rec. Doc. 3).  Defendants filed an amended counterclaim, adding claims for unfair trade practices, defamation, and interference with a contract under various state laws.  (Rec. Doc. 75).

On September 30, 2010, Plaintiff filed his second suit in the Eastern District of Michigan against LSE,  LSE Systems, Inc. ("LSE Systems"), Utility Construction Group, Inc. ("UCG"), and UO Group, alleging infringement of Plaintiff's '135 Patent under 35 U.S.C. § 271(a) and (c).  (Case No. 11-36, Rec. Doc. 1).  The Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1338(a).  The suit was transferred to this Court and captioned 11-36.  (Case No. 11-36, Rec. Doc. 28).  On  January 18, 2011, the two suits were consolidated.  (Rec. Doc. 34).  The determinations in this Order refer only to the patent infringement suit, Case No. 11-36.

### B. Patent and Specific Claims at Issue

The parties do not dispute the following facts concerning the general role of a rotary joint like the '135 Patent as a component of a paper-making machine.  Paper is made by conveying a mixture of cellulose fibers, water, and other chemicals over a series of rotating drums that are heated with steam.  Water in the mixture evaporates as the mixture moves from drum to drum.  This process turns the mixture into paper by the time it reaches the end of the manufacturing line.  The steam that heats the drums enters via rotary joints that are placed on each side of the drum.  Rotary joints allow the drum to rotate while passing liquid, which becomes steam, into and out of the drums.  As the drums heat up, they expand; as they cool, they contract.  This lateral, or axial, movement creates the potential for leakage of the drums, which creates difficulties in the paper-making process.  The '135

rotary joint represents a solution to this challenge in that, as Plaintiff's counsel explained at the

Markman hearing and Defendants do not dispute, it "handles the pressure and the steam and the

water that's flowing in and out without leaking."  (10/5/11 Tr. at 6).

The '135 Patent contains 12 claims. (Rec. Doc. 113, Ex. A at 6).  The relevant claims for

defining the five terms at issue, indicated in boldface type, are as follows:

> 1. A rotary joint for a rotating drum having a journal having an axis of rotation **characterized by its ability to accommodate axial expansion** comprising, in combination, an annular mounting flange having an axis and a central passage, fastening means defined on said flange for coaxially attaching said flange to the drum journal, an annular wear plate having a central passage having an axis coaxially mounted on said flange, a seal surface defined on said wear plate concentric to said plate axis, an elongated **housing** having an **internal chamber** having a longitudinal axis, said housing having a port for communicating with a fluid conduit fitting, **support means supporting said housing** substantially coaxial with the journal axis of rotation, a cylindrical nipple partially within said housing chamber having a longitudinal axis coaxial with said chamber axis, said **nipple being axially displaceable within said chamber**, annular first sealing means interposed between said nipple and said housing whereby said nipple is sealed with respect to said housing at all axial nipple positions within said chamber, and second sealing means interposed between said nipple and said wear plate.
>
> 6. In a rotary joint as in claim 1, said housing having a first end disposed toward said wear plate, an annular end cap mounted upon said housing first end, said first sealing means being mounted on said end cap.

(Rec. Doc. 113, Ex. A at 6) (emphasis added).

## II. LAW & ANALYSIS

### A. Applicable Law

A United States patent enjoys a presumption of validity.  35 U.S.C. § 282.  Validity of a

current patent lasts until a challenger carries its burden of persuading a court that the patent can no

longer be accepted as valid.  *Monsanto Co. v. Scruggs*, 342 F. Supp. 2d 584, 600 (N.D. Miss. 2004),

citing *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed. Cir. 1983).  The challenger must

do so by clear and convincing evidence. *Monsanto*, 342 F. Supp. 2d at 600 (citing *Loctite Corp. v.

Ultraseal Ltd.*, 781 F.2d 861, 872 (Fed. Cir. 1985) (overruled on other grounds).  If the challenger

cannot meet that burden, the court need only so state; it need not validate the patent at issue. *Monsanto*, 342 F. Supp. 2d at 600.

"The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others and the assurance that the subject of the patent will be dedicated ultimately to the public." *General Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 369 (1938). This is to prevent a "zone of uncertainty which . . . would discourage invention." *United Carbon Co. v. Binny & Smith Co.*, 317 U.S. 228, 236 (1942).

Whether a patent has been infringed is determined through a two-step analysis. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc) ("'[A] patent covers the invention or inventions which the court, in construing its provisions, decides that it describes and claims.'") (quoting 3 William C. Robinson, *The Law of Patents for Useful Inventions* § 1091, 247 (1890)), aff'd, 517 U.S. 370 (1996). First, the claims of the patent at issue must be construed to determine their meaning and scope; second, the claims must be compared to the allegedly infringing device. *Markman*, 52 F.3d at 976 (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992)). At this stage in the case, the Court is concerned only with the claim construction step in the infringement analysis. Accordingly, the allegedly infringing device will be considered only insofar as it provides meaningful context. The Court notes that the second step of a patent infringement analysis is a question of fact. *See DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed. Cir. 2001).

Claim construction, however, is a question of law to be decided by the Court. *Markman*, 52 F.3d 967, 977 (Fed. Cir. 1995) (en banc) aff'd, 517 U.S. 370. The meaning of some claim terms is sometimes "readily apparent even to lay judges," in which case claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *See*

4

*Phillips v. AWH Corp. (Phillips II)*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).  However, the meaning of a claim term is frequently not apparent.  *Phillips*, 415 F.3d at 1314.  Even if a term's meaning seems immediately apparent, persons skilled in the art often use those terms "idiosyncratically," and thus the layman's definition is incorrect or imprecise. *Phillips*, 415 F.3d at 1314.  Thus, in most cases, claims are construed from the perspective of a person of ordinary skill in the field of the invention.  *See Phillips*, 415 F.3d at 1312-1312.  Generally, both technical terms and common language contained in a patent claim will be interpreted as having the meaning that a person "experienced in the field of the invention" would understand it to have.  *Hoechst Celanese Corp. v. B.P. Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996).  Further, the meaning of the term is limited to what its meaning would have been as of the effective filing date of the application.  *Phillips*, 415 F.3d at 1313 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.

To properly construe a claim, the Court looks first at the intrinsic evidence of the patent record, which includes the claim language itself, the specification, and the relevant prosecution history.  *See Alza Corp. V. Mylan Laboratories, Inc.*, 391 F.3d 1365, 1370 (Fed. Cir. 2004) (citing *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001).  Courts must also look to other claims to interpret a disputed claim.  *Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 631 (Fed. Cir. 1987), *cert. denied*, 484 U.S. 1027 (1988) (overruled on other grounds by *Cardinal Chemical Co. v. Morton Intern., Inc.*, 508 U.S. 83 (1993)).  Under 35 U.S.C. § 112 ("specification statute"), the specification is composed of both a written description and the claims:

The specification shall contain a written description of the invention, and of the

5

manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention

      The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

35 U.S.C. § 112.  A claim can be independent of other claims or dependent on another claim.  A dependent claim "should not be construed to have the same scope [as its corresponding independent claim]; the dependent claim should have an additional limitation."  *Lasermax, Inc. v. Glatter*, 2005 WL 1981571, *4 (S.D.N.Y. 2005).  Relatedly, the doctrine of claim differentiation "precludes interpretations of claim language that render dependent claims too broad or independent claims too narrow, but it should not be used to interpret an independent claim too broadly either."  *Lasermax*, 2005 WL at *4.  Furthermore, when terms appear in different claims, the terms must be interpreted consistently across all claims.  *See Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995).  Finally, when a claim provides for two separate elements, and the claim "does not suggest that [one element] consists in part of a portion of the [other element]," the two elements are not the same component.  *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004).  Indeed, in that case, "'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention."  *Becton, Dickinson and Co. v. Tyco Healthcare Group LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (quoting *Gaus*, 363 F.3d at 1288).

      As the specification statute makes apparent, the claims "do not stand alone.  Rather, they are party of a '"fully integrated written instrument[.]"'"  *Phillips*, 415 F.3d at 1314 (citing *Markman*, 52 F.3d at 978).  "For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims."  *Markman*, 52 F.3d at 979.  The specification "'is always highly relevant to the claim construction analysis.  Usually, it is

6

dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1314

(quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "The close

kinship between the written description and the claims is enforced by the statutory requirement that

the specification describe the claimed invention in 'full, clear, concise, and exact terms.'" *Phillips*,

415 F.3d at 1311 (quoting 35 U.S.C. § 112). It is important to note, however, that limitations from

the specification should not be imported into the claims. *Retractable Technologies, Inc. v. Becton,

Dickinson and Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) ("There is a fine line between construing

the claims in light of the specification and improperly importing a limitation from the specification

into the claims.").

In terms of intrinsic evidence, besides the claims and description, courts should also

investigate the patent's prosecution history. The prosecution history "often lacks the clarity of the

specification and thus is less useful for claim construction purposes" because it consists of an

"ongoing negotiation between the [Patent & Trademark Office ("PTO")] and the applicant, rather

than the final product of the negotiation." *Phillips*, 415 F.3d at 1317. Nevertheless, it should not

be ignored because it can "often inform the meaning of the claim language by demonstrating how

the inventor understood the invention and whether the inventor limited the invention in the course

of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d

at 1317 (citing *Vitronics*, 90 F.3d at 1582-1583). The purpose of holding a patentee to the claim

construction that was argued during the patent prosecution is to preserve the public's reliance on the

public records. *Springs Window Fashions LP v. Novo Industries, L.P.*, 323 F.3d 989, 995 (2003).

A patent's prosecution history may include that of patents originating from the same parent patent.

*NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005). The prosecution

history of the foreign counterpart of a U.S. patent may be considered if it is relevant. *See Caterpillar*

7

*Tractor Co. v. Berco, S.p.A.*, 714 F.2d 1110, 1116 (Fed. Cir. 1983).  This is true even though "the varying legal and procedural requirements for obtaining patent protection in foreign countries might render consideration of certain types of representations inappropriate." *Caterpillar*, 714 F.2d at 1116.

The doctrine of claim construction differs in some ways for claims containing "means-plus-function" language.  The parties agree, as does this Court, that the fifth term to be defined, "support means supporting said housing substantially coaxial with the journal axis of rotation," contains such language.  The specification statute states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of the structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification *and equivalents thereof*.

35 U.S.C. § 112 (emphasis added).  The Federal Circuit has explained that "[t]he construction of a means-plus-function limitation includes two steps.  First, we determine the claimed function.  Second, we identify the corresponding structure in the written description that performs that function." *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005) (citations omitted).  In the second step, "'structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.'" *Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003) (quoting *B. Braun Med. Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997)).

As the specification statute explains, equivalents of a means-plus-function claim that "extend beyond that which is explicitly disclosed in the patented document itself" can be interpreted to fall under the claim's scope. *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1347 (Fed. Cir. 2001).

8

However, that scope "does not extend to all means for performing a certain function.  Rather, the scope of such claim language is sharply limited to the structure disclosed in the specification and its equivalents."  *J&M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1367 (Fed. Cir. 2001).

To determine whether or not a structure constitutes an equivalent of the structure described in a means-plus-function claim, courts examine whether only "insubstantial" differences exist between the structure described in the specification and its purported equivalent.  *Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.*, 145 F.3d 1303, 1309 (Fed. Cir. 1998) ("The proper test is whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial.").  In addition, courts may look to whether the purported equivalent functions "substantially the same way" as the structure described in the specification.  *Kemco Sales, Inc. v. Control Papers Co., Inc.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000) ("[T]wo structures may be 'equivalent' for purposes of section 112, paragraph 6 if they perform the identical function, in substantially the same way, with substantially the same result.").  As with non means-plus-function claims, the prosecution history may aid the court in interpreting means-plus-function claims.  *Alpex Computer Corp. v. Nintendo Co. Ltd.*, 102 F.3d 1214, 1221 (Fed. Cir. 1996) ("Just as prosecution history estoppel may act to estop an equivalence argument under the doctrine of equivalents, positions taken before the PTO may bar an inconsistent position on claim construction under § 112[.]") (citations omitted).

When interpreting claims, be they means-plus-function claims or not, "intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics*, 90 F.3d at 1582.  Nonetheless, the Court may also consider extrinsic evidence, such as technical manuals and drawings, dictionaries, expert testimony, and the testimony of the inventor, to understand the technology involved in the patent and the allegedly infringing device.  *See EMI*

9

*Group N. Am., Inc. v. Intel Corp.*, 157 F.3d 887, 892 (Fed. Cir. 1998).   However, this extrinsic

evidence may not be used to contradict or alter the intrinsic evidence.   *See Mantech Envtl. Corp. v.*

*Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1373 (Fed. Cir. 1998).


**B. Meaning of the Disputed Terms**

   **1. "Housing"**

   In their claim construction briefs, Plaintiff argue that "Housing" means "[a]n enclosure for

containing a cylindrical nipple." (Rec. Doc. 179 at 5).  Defendant argues that it means "the structure

of the rotary joint between (and not including) the end cap and a conduit introducing fluid into or

receiving fluid from the rotary joint."  (Rec. Doc. 166 at 16).  At the Markman hearing and in the

parties' post-Markman briefs, it became apparent that the core dispute is whether "Housing" should

be interpreted so broadly as to include other claim terms and in particular the "End Cap," a claim

term defined in Claim 6.  The issue is not, as Plaintiff contends, whether "Housing" must be formed

in a unitary structure.  Defendants have not made such an argument.  Instead, they argue that "End

Cap" is not part of "Housing."   In order for "Housing" to be interpreted consistently across all

claims, as it must, *see Southwall*, 54 F.3d at 1579, the Court finds that "End Cap" cannot be part of

"Housing."  Claim 6 states that in a rotary joint as described in Claim 1, a "housing having a first

end disposed toward said wear plate, an annular end cap mounted upon said housing first end, said

first sealing means being mounted on said end cap."  Col. 6, lines 9-12.  Nothing in this sentence

indicates that "End Cap" is part of "Housing."  Accordingly, they are two distinct components.  *See*

*Gaus*, 363 F.3d at 1288.

   In addition, as Defendants indicate in their post-Markman brief, the specification's

description of where "Housing" begins and ends indicates that "Housing" does not encompass "End

Cap." (Rec. Doc. 229 at 3). In particular, the description states: "[t]he fluid medium passing through the joint 10 communicates with the housing chamber 60 by means of the fitting 108 attached to the housing end," Col. 4, lines 13-15, and "[a]n annular end cap 74 is mounted upon the inner housing end 58 by a plurality of bolts 76 threaded into the housing." Col. 3, lines 42-44. The Court is aware that claims should not be strictly limited to the embodiments disclosed in the specification's written description, but claim language should not be "divorced" from the description. *Retractable*, 653 F.3d at 1305 (Fed. Cir. 2011). Here, the clear language describing the ends of "Housing" cannot be ignored. Accordingly, the Court adopts Defendants' definition of "Housing," and the case Plaintiff cites to dispel the notion that the housing is unitary is irrelevant. (Rec. Doc. 226 at 2) (quoting *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1309 (Fed. Cir. 2005)).

### 2. "Internal Chamber"

Plaintiff argues that "Internal Chamber" means "[t]he internal space that the housing surrounds, and into which the nipple is displaceable." (Rec. Doc. 179 at 5). Defendants contend that it means "the internal space of the housing between the two housing ends." (Rec. Doc. 166 at 17). Claim 1 states that the rotary joint includes "an elongated housing having an internal chamber having a longitudinal axis[.]" Col. 5, lines 25-26. Defendants do not dispute that the nipple is displaceable within the housing's internal chamber. Rather, the dispute is closely related to that in interpreting "Housing." Because the Court agrees with Defendants regarding the delimitations of "Housing," it adopts Defendant's definition of "Internal Chamber." The Court sees no need to add Plaintiff's clause regarding the nipple.

### 3. "Nipple Being Axially Displaceable Within Said Chamber"

Plaintiff states that "Nipple Being Axially Displaceable Within Said Chamber" means that

11

"at least part of the nipple is interior to the housing chamber and part of the nipple is exterior to the housing chamber and is moveable along an axis within the chamber."  (Rec. Doc. 179 at 5). Defendant states that the term means "at least part of the nipple must actually extend into the housing and be able to move within the housing."  (Rec. Doc. 166 at 18).   Claim 1 recites that a rotary joint has a "cylindrical nipple partially within said housing chamber having a longitudinal axis coaxial with said chamber axis, said nipple being axially displaceable within said chamber[.]"  Col. 5, lines 30-33.  The Court concludes that the parties' definitions are not materially different.  The Court agrees with Plaintiff that the term "partially" indicates that part of the nipple is inside the chamber, and part of the nipple is outside of the chamber, and it does not object to the additional clarity that Plaintiff's definition offers.  Accordingly, the Court adopts Plaintiff's definition of "Nipple Being Axially Displaceable Within Said Chamber."

### 4. "Characterized by Its Ability to Accommodate Axial Expansion"

Plaintiff's definition of "Characterized by Its Ability to Accommodate Axial Expansion" is "capable of adjusting its dimension along the axis of rotation of the drum journal as the drum and journal extend their length."  Defendant define that term as "the axial expansion accommodated by the nipple moving relative to the housing and this movement must be greater in degree than that shown in the prior patents cited by the patentee in the '135 Patent's file history." (Rec. Doc. 166). Claim 1 defines the '135 Patent as "[a] rotary joint for a rotating drum having a journal having an axis of rotation characterized by its ability to accommodate axial expansion[.]" Col. 5, lines 17-19.

Expansion is a commonly understood word, and Defendants do not convince the Court that a person skilled in the art understands the term differently in the context of paper-making machine dryer drums that become larger due to heat.  Thus, the claim term can be defined solely by examining the claim itself, which does not quantify the extent of the rotary joint's ability to manage

the drum's expansion. Instead, it merely states that the rotary joint has that ability, and nothing in Claim 1 or any of the other claims describes the extent of this "ability." Defendants state that portions of the written description in the specification indicate that this "ability" must be substantial. (Rec. Doc. 166 at 19). For instance, the description explains that "[i]t is an object of the invention to provide a rotary joint for use with rotary drum type heat exchangers which is capable of accommodating large axial dimensional variations due to thermal expansion and contraction." Col. 1, lines 45-49. The description also states that "[a]n additional object of the invention is to provide a rotary joint capable of accommodating significant dimensional variations." Col. 1, lines 54-60. While these adjectives may suggest that the term at issue should be limited to a certain amount of expansion, the Court agrees with Plaintiff that the PTO would have required Plaintiff to add such qualifiers to the claim term if it so intended to limit the claim. Accordingly, the Court adopts Plaintiff's definition of this term.

### 5. "Support Means Supporting Said Housing"

Plaintiff defines "Support Means Supporting Said Housing" as "[a]ny rigid support holding the housing." (Rec. Doc. 179 at 6). In contrast, Defendants define it as "the '135 support assembly and equivalent structures, but not a ring bracket which is not an equivalent structure." (Rec. Doc. 166 at 28). Thus, the narrow dispute here is whether a ring bracket is an equivalent structure to the claim in question. According to Claim 1, one of the elements of a rotary joint is a "support means supporting said housing substantially coaxial with the journal axis of rotation." Col. 5, lines 28-30.

The Court does not adopt Plaintiff's definition because it is too broad. While the scope of a means-plus-function claim such as the one at issue extends beyond the function in the claim and includes equivalents of that function, that scope is not limitless. *See J&M Corp.*, 269 F.3d at 1367. The first step of a means-plus-function claim analysis is to determine the claimed function. *See JVW*

*Enterprises*, 424 F.3d at 1330.  The Court finds, and the parties do not dispute, that the function of a "support means supporting said housing" is "supporting said housing substantially coaxial with the journal axis of rotation."  Col. 5, lines 29-30.  The second step requires the Court to identify the corresponding structure in the specification's description that performs that function.  *See JVW Enterprises*, 424 F.3d at 1330.  The corresponding structure is depicted as the yoke 62 operating with the rods 66 and the brackets 72, depicted in Figures 3 and 4 of the '135 Patent (together, "'135 support means").  The tests for determining whether a structure is an "equivalent" to the structure disclosed in the specification are whether there are "insubstantial" differences between the two or whether the two function in "substantially the same way."  *See Chiuminatta*, 145 F.3d at 1309; *Kemco*, 208 F.3d at 1364.

Plaintiff has not convincingly rebutted Defendants' contention that a support means that supports the housing along the same axis as the journal axis of rotation can do so in a different manner than the '135 support means does.   Defendant's expert testimony and the patent history of the Chinese version of the '135 Patent indicates that the limitation in Defendants' definition, namely, that the "ring bracket" is not an equivalent structure to the "Support Means Supporting Said Housing" in the '135 Patent, is appropriate.  First, Defendants' expert, Dr. James Rice, stated in a Declaration that the differences between the ring bracket and the '135 support means are substantial because the ring bracket can withstand stresses associated with a cantilever siphon of the type used in the allegedly infringing device better than the '135 support means can.  (10/5/11 Tr. at 54; Rec. Doc. 166, Ex. C at ¶ 21).   He also testified that the computer simulation model that he ran to compare the '135 joint's versus the allegedly infringing device's ability to withstand stresses associated with a cantilever siphon demonstrated that the former "failed" in "all cases."  (10/5/11 Tr. at 52).  While Dr. Rice acknowledged that he has no results from actual tests, (10/5/11 Tr. at 50),

the Court finds the computer simulation to be instructive.  He also stated that it is substantially easier to mount a rotary joint using a ring bracket compared with the '135 support means.  (Rec. Doc. 166, Ex. C at 22).  Additionally, unlike the '135 support means, which causes the housing to remain stationary relative to the thermal expansion of the dryer drum, a ring bracket moves the housing to the same degree that the ring bracket itself moves.  (Rec. Doc. 166, Ex. C at ¶ 24).  This feature prevents the nipple in a rotary joint supported by a ring bracket from moving within the housing as the drum expands and contracts.  This, in turn, enhances the rotary joint's ability to accommodate axial expansion.  (Rec. Doc. 166, Ex. C at ¶ 24).  Plaintiff responds that the '135 support means, composed of the rods, yokes, and support structure depicted in Figures 3 and 4, constitutes a "plurality of elongated supports securing the rotary joint to some fixed surface in the surrounding environment." (Rec. Doc. 179 at 17).  Besides this generalized contention, Plaintiff does not attempt to refute Defendants' expert's conclusion that the a ring bracket of the type described by Defendants is substantially different than the support means depicted in the '135 Patent.

Second, Plaintiff's statements to the Patent Reexamination Board of the Chinese Intellectual Property Office through its Chinese subsidiary Kadant Johnson (Wuxi) Technology Co., Ltd. ("Kadant Wuxi") suggest that Plaintiff does not consider a ring bracket to be the equivalent of the '135 support means.  In that dispute, a third party challenged the validity of Chinese Patent 0264368.0 ("'368.0 Patent"), on the ground that another patent, Chinese Patent 91103998.8 ("'998.8 Patent"), was too similar.  Defendant argues that the '998.8 Patent, owned by Kadant Wuxi, is the Chinese equivalent of the '135 Patent on the ground that the '998.8 patent claims priority to the '135 Patent and depicts the same drawings as the '135 Patent.  (Rec. Doc. 166 at 27, note 10).  In the Chinese dispute, Kadant Wuxi argued that the "annular ring bracket" in the '368.0 Patent was distinct from Kadant Wuxi's support means for some of the same reasons that Dr. Rice outlined in

15

comparing the '135 support means with the ring bracket. (Rec. Doc. 166, Ex. D at 34). Namely, Kadant Wuxi argued that its support means was stationary, whereas the ring bracket allows "axial and radial position of the joint relative to the drying cylinder"; and that the ring bracket was "more easily controlled during the mounting process." (Rec. Doc. 166, Ex. D at 34). Plaintiff cites *Abbott Laboratories v. Dey, L.P.* for the proposition that a party may not use an unrelated patent's prosecution history to construe a claim in the patent before the court, where an "unrelated" means that the offending patent is not a continuation from a common application, for instance. 287 F.3d 1097, 1104-1105. However, that rule exists in context of a prosecution history estoppel argument by the alleged infringer. Defendants are not making such an argument, and Plaintiff offers no authority showing that this exclusionary rule is equally applicable at the claim construction stage of a patent lawsuit. Indeed, relevant foreign prosecution history of a related patent is "instructive," even if it does not have "the force of preclusion."*Merk & Co., Inc. v. Mylan Pharmaceuticals, Inc.*, 19 F. Supp. 2d 334, 344, note 17 (E.D. Pa. 1998), *aff'd*, 190 F.3d 1335 (Fed. Cir. 1999). The Court finds that the statements made by Kadant Wuxi are helpful in determining whether or not a ring bracket is the equivalent of the '135 support means, and it agrees with Defendant that it is not. Thus, the Court interprets "Support Means Supporting Said Housing" as "the '135 support assembly and equivalent structures, but not a ring bracket." The Court does not decide whether the particular support means in Defendants' allegedly infringing device constitutes a support means that is or is not equivalent to the '135 support means, as it has not had the opportunity to examine that device, and as that determination is a question of fact for the fact finder. *See DeMarini*, 239 F.3d at 1322; *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999) ("Whether an accused device infringes a [35 U.S.C.] § 112, ¶ 6 [i.e. means-plus-function] patent claim as an equivalent is a question of fact.").

16

Accordingly,

IT IS ORDERED that the disputed claims are defined as set forth herein.


New Orleans, Louisiana, this 23rd day of February, 2012.


**HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**