**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **KADANT JOHNSON, INC.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 10-2869**<br>*Pertains only to 10-2869* |
| **JOSEPH V. D'AMICO, LOUISIANA STEAM**<br>**EQUIPMENT, LLC and UTILITIES**<br>**OPTIMIZATION GROUP, LLC** | **SECTION "C" (2)** |

## ORDER

Before the Court are three Motions pertaining to Case No. 10-2869 in this consolidated matter. They are: (1) Motion for Partial Summary Judgment filed by Defendants ("Defendants' First Motion for Partial Summary Judgment") (Rec. Doc. 259); (2) Motion for Partial Summary Judgment filed by Plaintiff (Rec. Doc. 265); and (3) Motion for Partial Summary Judgment filed by Defendant ("Defendants' Second Motion for Partial Summary Judgment") (Rec. Doc. 304). Based on the memoranda of counsel, the record, and the law, the Court DENIES Defendants' First Motion for Partial Summary Judgment; GRANTS Plaintiff's Motion for Partial Summary Judgment; and DENIES Defendants' Second Motion for Partial Summary Judgment for the following reasons.

## I. BACKGROUND

The following facts are undisputed. Plaintiff Kadant Johnson, Inc. ("Plaintiff") and Defendant Louisiana Steam Equipment, LLC ("LSE") have maintained a business relationship since

the 1930s.  Their dispute involves four agreements.

First, on May 14, 1993, Johnson Corporation (Plaintiff's predecessor) and LSE entered into a Manufacturer's Agent Agreement ("MAA").  (Rec. Doc. 259, Ex. A, Ex. 1).  Pursuant to the MAA, LSE sold Plaintiff's products in specified geographic locations.  The MAA was terminated January 16, 2010.  (Rec. Doc. 259, Ex. A, Ex. 5; Rec. Doc. 259, Ex. A., Ex. 1, ¶ 5.01).

Second, on August 6, 1999, Defendant Joseph V. D'Amico ("D'Amico"), president and owner of LSE, and Plaintiff entered into an Operating Agreement ("OA").  (Rec. Doc. 259, Ex. A, Ex. 2).  The OA created the joint venture Johnson Southeast, LLC, also known as the Regional Center.  The OA permitted the Regional Center to sell Plaintiff's products in specified geographic locations that were distinct from LSE's area as defined by the MAA.  It contained a non-disclosure provision and a non-competition provision.  (Rec. Doc. 259, Ex. A, Ex. 2, ¶¶ 11.1, 11.2).

Third, on the same day that the OA was executed, D'Amico and Plaintiff entered into a Non-Disclosure Agreement ("NDA").  (Rec. Doc. 259, Ex. A, Ex. 3).  The purpose of the NDA was to prevent Kadant's "Confidential Information" from being used or disclosed by Defendants.  (Rec. Doc. 259, Ex. A, Ex. 3, ¶ 1.5).  To implement its purpose, the NDA contains non-disclosure, non-competition, and non-solicitation covenants, the validity and scope of which are at the heart of the three Motions before the Court.  (Rec. Doc. 259, Ex. A, Ex. 3, Arts. 3-5).

The non-disclosure provision of the NDA states that it applies indefinitely, whether or not the parties have an ongoing agreement:

> D'AMICO and the D'AMICO CONTROLLED ENTITIES' obligation to preserve the confidentiality of each item of Confidential Information disclosed hereunder shall never terminate, notwithstanding the termination of all the agreements between JOHNSON or any other entity of the Johnson Corporation organization and D'AMICO or any D'AMICO CONTROLLED ENTITY.

(Rec. Doc. 259, Ex. A, Ex. 3, ¶ 3.3).

The non-competition provision of the NDA states that it applies during the existence of any agreement between the parties, and two years following the termination of any such agreement:

> During the period that any agreement exists between JOHNSON or any entity of The Johnson Corporation organization, including the REGIONAL CENTER, and D'AMICO or any D'AMICO CONTROLLED ENTITY, and for a period of two (2) years following the termination of all such agreements, (for any reason and whether with or without cause), D'AMICO and the D'AMICO CONTROLLED ENTITIES shall not engage in any of the following activities: ....

(Rec. Doc. 259, Ex. A, Ex. 3, ¶ 4.1).

The non-solicitation provision mirrors the non-competition provision in terms of when it applies:

> During the period that any agreement exists between JOHNSON or any other entity of The Johnson Corporation organization, including the REGIONAL CENTER, and D'AMICO or any D'AMICO CONTROLLED ENTITY, and for a period of two (2) years following the termination of all such agreements: . . . .

(Rec. Doc. 259, Ex. A, Ex. 3, ¶ 5.1). Defendants seek a ruling that these three provisions are invalid, or alternatively, that they applied only to the OA, and not to the MAA. Plaintiff seeks a ruling that the three covenants are valid, and that they applied to all agreements between the parties, including the MAA. Of the four agreements at issue, Plaintiff alleges that Defendants breached only the NDA. The NDA contains a Michigan choice of law provision, but Defendants argue that the Court should apply Louisiana law in this dispute. (Rec. Doc. 259, Ex. A, Ex. 3, ¶ 8.3).

Fourth, on December 20, 2006, D'Amico and Plaintiff executed a Buyout Agreement ("BA"). (Rec. Doc. 259, Ex. A, Ex. 4). Under the BA, Plaintiff bought all of D'Amico's interest in the Regional Center. The BA contains three significant provisions for resolving the instant Motions.

The "Entire Agreement" provision states:

> This Agreement constitutes the full and complete agreement of the parties with respect to

the subject matter of this Agreement and modifies and supercedes all prior writings, including the Operating Agreement and all amendments thereto, orally or written. This Agreement constitutes an amendment to the Operating Agreement. To the extent any provision of this Agreement is inconsistent with any provision of the Operating Agreement, the parties hereto agree that the Operating Agreement shall be deemed modified to make the transactions contemplated in this Agreement consistent with the Operating Agreement.

(Rec. Doc. 259, Ex. A, Ex. 4, ¶ 6.6). Defendants claim that the NDA was of the same "subject matter" as the OA, and that it was one of the "prior writings" which the BA amended or terminated. Plaintiff contends that paragraph 6.6 of the BA amended or terminated only the OA, not the NDA, and that "all prior writings" referred to prior versions of the OA and did not cover the NDA.

The "Non-disclosure and Non-competition Obligations" provision preserved the non-disclosure and non-competition provisions of the OA: "The obligations of the parties under Articles 11.1 and 11.2 of the Operating Agreement shall survive the Closing Date and remain applicable as provided under the Operating Agreement." (Rec. Doc. 259, Ex. A, Ex. 4, ¶¶ 4.3). Still relying on its theory that the NDA is a "prior writing" that was part and parcel of the OA, Defendants contend that because the BA explicitly conserved the OA's non-disclosure and non-competition covenants, it is logical to conclude that the BA did not conserve the NDA's non-disclosure, non-competition, and non-solicitation covenants. Plaintiff denies that the NDA was a "prior writing" of the OA and claims that the BA did not amend or terminate the NDA covenants.

Finally, the "Mutual Release" clause reads:

Except with respect to the representations, warranties, indemnities and covenants contained in this Agreement, on the Closing Date, each of KJI [Kadant] and JVD [D'Amico] releases the other party from any and all claims the releasing party ever had, now or hereafter can, shall, or may have against the other for, upon, or by reason of: any matter, cause, or thing whatsoever related to the formation or operation of KJSE [the Regional Center] to the date of this Agreement, without regard to when such claims arose, arises, or is discovered.

(Rec. Doc. 259, Ex. A, Ex. 4, ¶ 3.5). Defendants claim that Plaintiff's instant action for breach of the NDA is barred by paragraph 3.5 of the BA because it is "related to the formation or operation"

of the Regional Center. Plaintiff contends that the NDA is not related to the formation or operation of the Regional Center to the extent it affects agreements other than the OA, such as the MAA.

In summary, Defendants' First Motion for Partial Summary Judgment argues that (1) paragraph 6.6 of the BA terminated the NDA because it was of the same "subject matter" as the OA and was a "prior writing" under that clause; (2) Plaintiff waived any legal claims related to the NDA because the NDA was "related to the formation or operation" of the Regional Center; and (3) the NDA covenants did not cover the MAA because the MAA was not mentioned in and had nothing to do with the NDA. (Rec. Doc. 259). In their Opposition to Plaintiff's Motion for Partial Summary Judgment and their Second Motion for Partial Summary Judgment, Defendants also argue that (4) the NDA should be governed by Louisiana law, and that the NDA's non-competition and non-solicitation provisions are invalid because (a) D'Amico signed the NDA as an employee; and (b) Plaintiff's failure to provide Defendants with "confidential technologies," as required under the NDA, annulled Defendants' consent to the agreement; (5) the NDA is invalid even under Michigan law because (a) it is over-broad; and (b) Plaintiff frustrated its purpose; and (7) the liquidated damages provision of the NDA is invalid under Louisiana and Michigan law because it constitutes a penalty.

In its Opposition to Defendants' First Motion for Partial Summary Judgment, Plaintiff argues that (1) the NDA covered the MAA because the language of the covenants indicate that they applied to "all" agreements, not just the OA; and (2) the BA terminated the OA and did not terminate the completely separate NDA. (Rec. Doc. 269). In its Motion for Partial Summary Judgment, Plaintiff also argues that (3) the NDA is valid under Michigan law because it is reasonable and not over-broad in terms of duration, geography and the scope of activities it restricts. (Rec. Doc. 265). Finally, in its Opposition to Defendants' Second Motion for Partial Summary Judgment, it argues

that (4) Michigan law applies because of the NDA's choice of law clause, and the NDA is valid under Michigan law because (a) it is not over-broad and (b) the frustration of purpose doctrine does not apply; (5) even if Louisiana law applies, the NDA is valid because (a) D'Amico signed it not as an employee but as an "investor," and the contract bound not just him but also all D'Amico controlled entities; and (b) no provision of the NDA *required* Plaintiff to give certain confidential technologies to D'Amico, and thus, even if Plaintiff failed to hand over those technologies, such failure did not vitiate D'Amico's consent to the contract; and (6) the NDA's liquidated damages clause is valid under both Michigan and Louisiana law.  (Rec. Doc. 312).

## II. LAW & ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper only when the record indicates that there is not a "genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A genuine issue of fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1996).  When considering a motion for summary judgment, this Court "will review the facts drawing all inferences most favorable to the party opposing the motion."  *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. V. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, however, "the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a

genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). In order to satisfy its burden, the non-moving party must put forth competent evidence and cannot rely on unsubstantiated assertions and conclusory allegations. *See Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994).

**B. Choice of Law**

The NDA contains a Michigan choice of law provision that states: "This Agreement, the rights and obligations of the parties hereto, and any claim or dispute hereunder, will be governed by and construed in accordance with the laws of the State of Michigan, without regard to its choice of law provisions." (Rec. Doc. 259, Ex. A, Ex. 3, ¶ 8.3). The parties agree that Alabama law applies for determining choice of law in this case because the suit was initially brought in Alabama state court on June 21, 2010. (Rec. Doc. 1-8; Rec. Doc. 316 at 6-7; Rec. Doc. 311 at 3). Defendants removed the case to the Middle District of Alabama on July 6, 2010. (Rec. Doc. 1-2). Defendants then moved to transfer the case to this Court because it was related to Defendants' declaratory action before this Court, which they had filed on May 28, 2010. (Rec. Doc. 1-7). The case was transferred to the Eastern District of Louisiana on August 31, 2010 (Rec. Doc. 1-29).[1]

Alabama law mandates that this Court apply Michigan law. When interpreting a contract with a choice of law provision, Alabama courts apply the law in that provision, unless the parties' choice of law would contradict Alabama's fundamental public policies. *See Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 506-508 (Ala. 1991). The *Cherry* court held that the North

---

[1]In an apparent coincidence, Defendants' declaratory action before this Court was dismissed the same day that Plaintiff's instant breach of contract case was transferred to this Court from the Middle District of Alabama. (Case No. 10-1600, Rec. Doc. 16).

Carolina choice of law provision in an employment contract was invalid where the employer sought to enforce a no-competition covenant because of Alabama's policy against covenants to compete and because the covenant was to be enforced in Alabama against an Alabama resident. 582 So. 2d at 507-508. The Alabama Code indicates that restraints on trade are not favored in that state. Ala. Code § 8-1-1(a). However, Alabama allows such restraints if "(1) the employer has a protectable interest; (2) the restriction is reasonably related to that interest; (3) the restriction is reasonable in time and place; (4) the restriction imposes no undue hardship." *Ex Parte Caribe, U.S.A., Inc.*, 702 So. 2d 1234, 1239 (Ala. 1997) (quoting *DeVoe v. Cheatham*, 413 So. 2d 1141, 1142 (Ala. 1982)) (citing Ala. Code § 8-1-1).

The Court is unpersuaded that enforcement of the NDA non-disclosure, non-competition, and non-solicitation provisions would run afoul of Alabama public policy. First, it cannot be disputed that Plaintiff has an interest in preventing Defendants from disclosing or using the information and technology at issue in the NDA. Second, the covenants relate to that interest in that they intend to restrain disclosure and use of the information.

Third, the covenants are not so unreasonable in duration or geographic scope to be stricken by an Alabama court in their entirety. The non-competition and non-solicitation covenants apply only during the existence of an agreement between the parties, plus two years after the agreement terminates, and the non-disclosure covenant applies indefinitely. Two years is not an unreasonable duration for a non-compete covenant in Alabama. *Central Bancshares of the South, Inc. v. Puckett*, 584 So. 2d 829, 831 (Ala. 1991) (holding that two-year restriction was reasonable); *James S. Kember & Co. Southeast, Inc. v. Cox*, 434 So. 2d 1380, 1384 (Ala. 1983) ("[T]here can be no doubt that a two-year period for the [restrictive covenant] is reasonable."). Defendants never argue that the duration of the non-disclosure provision was unreasonable. As for geographic scope, the non-

8

competition covenant applies "anywhere in the world related to [Plaintiff's] joint, syphon, and steam drying technology," among other technologies of Johnson. (Rec. Doc. 259, Ex. A, Ex. 3, ¶ 4.1). The non-solicitation provision does not include a specific geographic scope. However, its definition of "Existing Customer," as anyone who was a customer at the time of the termination of the agreements, limits the scope of the provision in a similar manner to paragraph 4.1 with respect to the non-competition provision. (Rec. Doc. 259, Ex. A, Ex. 3, ¶ 5.1). The non-disclosure covenant does not contain a specific geographic restriction. A covenant is not necessarily unreasonable because it does not specify where it applies. *Clark v. Liberty Nat'l Life Ins. Co.*, 592 So. 2d 564, 566 (Ala. 1992) (upholding non-solicitation and non-competition covenants even though their geographic scope was not defined). Furthermore, an unspecified geographic scope does not invalidate the entirety of each covenant, as Alabama allows courts to rewrite or strike portions of covenants that they deem unreasonable. *See Mason Corp. v. Kennedy*, 244 So. 2d 585, 590 ("We hold that a court of equity has the power to enforce a contract against competition although the territory or period stipulated may be unreasonable, by granting an injunction restraining the respondent from competing for a reasonable time and within a reasonable area.").

Fourth, there is no risk of undue hardship. Defendants are sophisticated entrepreneurs who have had a business relationship with Plaintiff for over seventy-five years, and who have not alleged that they signed the NDA without knowledge of the Michigan choice of law provision or without consenting to that provision. Indeed, Defendants have relied on Michigan law in numerous filings in this case.

Finally, Alabama courts have upheld choice of law provisions where the contract contained a restrictive covenant. *See, e.g., Ex parte Healthsouth Corp.*, 974 So. 2d 288, 295 (Ala. 2007) (upholding Michigan choice of law provision with respect to covenant not to sue between a

professional corporation and a corporation); *Sylvan Learning, Inc. v. Gulf Coast Education, Inc.*, 2010 WL 3943643, at *2 (M.D. Ala. 2010) (upholding Maryland choice of law provision as to covenant not to compete in an employment contract between a corporation and another corporation and its employee). Unlike in *Cherry*, this case has little connection to Alabama, since the Plaintiff is a Michigan resident suing defendants not located in Alabama.

Defendants argue that under Alabama law, a choice of law provision does not apply where it violates the public policy of the state where the contract exists; instead, the Court should apply the law of the state in which the contract exists. (Rec. Doc. 311 at 3). Defendants do not cite to specific authority for this proposition. Indeed, in Alabama, *Alabama* law applies when a foreign choice of law provision is contrary to Alabama public policy, and there is no indication that courts should apply the law of the state in which the contract was made or exists. *Cherry*, 582 So. 2d at 507-508 ("[W]here the parties' choice of law would be contrary to the fundamental public policies of the forum state, *Alabama*, the parties' choice of law could not be given effect and . . . the *forum* must control the agreement.") (emphasis added).

The Court nevertheless considers the NDA's ties to Louisiana, the state in which Defendant apparently contends that the NDA "exists." (Rec. Doc. 311 at 3). Defendant states that D'Amico signed the NDA and worked out of Louisiana. (Rec. Doc. 301 at 1). Defendants add that Louisiana law applies because the contract was "executed in Louisiana, related directly to a Joint Venture which (for the most part) operated out of Louisiana, and the enforcement of the NDA affects one individual and his operating entities based primarily in Louisiana." (Rec. Doc. 311 at 3).

None of these arguments are persuasive because the contract was also executed by Plaintiff, a Michigan entity, and the Joint Venture in the OA was created by forming a limited liability company in Georgia, (Rec. Doc. 259, Ex. A, Ex. 2, ¶ 2.1), and the OA has a Georgia choice of law

provision. (Rec. Doc. 259, Ex. A, Ex. 2, ¶ 16.11). Moreover, the employees of the Regional Center were located in Tennessee, Florida, and North Carolina, as indicated in Schedule 2.6 of the OA. (Rec. Doc. 476-2 at 15). Although the NDA has more ties to Louisiana than it does to Alabama, those ties are not strong. Accordingly, the Court upholds the NDA's Michigan choice of law provision.

**C. The NDA Under Michigan Law**

1. Scope

In Michigan, whether or not a non-compete provision is over-broad depends in part on the relationship between the parties to the agreement. Restrictive covenants are viewed less favorably in the employer-employee context than in the commercial context. *Great Lakes Spice Co. v. GB Seasonings, Inc.*, 2005 WL 3216222, *2 (E.D. Mich. 2005). Here, the Court finds that there is no genuine issue of fact whether the NDA is an employer-employee contract. Defendants contend that D'Amico, the signatory of the NDA for the Defendants, was an employee of the Regional Center. However, the NDA indicates that he was an "investor," not an employee. (Rec. Doc. 259, Ex. A, Ex. 3, ¶ 1.1). Furthermore, the non-disclosure, non-competition, and non-solicitation provisions of the NDA restrict the behavior not just of Mr. D'Amico, but of all D'Amico controlled entities. (Rec. Doc. 259, Ex. A, Ex. 3, ¶¶ 3.1, 4.1, 5.1). Finally, D'Amico was not listed among the employees of the Regional Center in the OA's Schedule 2.6, and the BA explicitly stated that the Regional Center "had no other employee . . . except as set forth on Schedule 2.6 [of the OA]." (Rec. Doc. 476-2 at 15; Rec. Doc. 259, Ex. A, Ex. 4, ¶ 2.6).

In support of their argument, Defendants point to Plaintiff's former CFO, James Dechnik's testimony that D'Amico signed the NDA as an employee of the Regional Center. (Rec. Doc. 301,

Ex. B, at 148). Plaintiff's former President, Rudi Leerentveld testified that he was under the assumption that "all of our people signed [the NDA] as employees," and that D'Amico "was asked to sign [the NDA] as an employee" of the Residential Center." (Rec. Doc. 301, Ex. A, at 166-167). Without more, this testimony is insufficient to surmount the unambiguous provision in the NDA that D'Amico was an "investor," the indication in the OA that D'Amico was not an employee of the Residential Center, and the indication in the BA that the Regional Center did not have employees other than those listed in the OA's Schedule 2.6. Accordingly, the Court does not view the NDA as an employer-employee contract.

The NDA is not over-broad under Michigan law even if D'Amico signed it as an employee of the Residential Center. Michigan Compiled Law Section 445.774a(1) states:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such an agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

M.C.L. § 445.774a(1).

Like Alabama, Michigan has upheld non-competition covenants lasting two years. *See, e.g., Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 549 (6th Cir. 2007) (holding a non-competition provision that lasted two years on the ground that it is "a period which Michigan courts have consistently upheld as reasonable . . . ."). Further, Defendant does not contend that the duration of any of covenants in the NDA is unreasonable. Indeed, Defendants point to no authority forbidding indefinite non-disclosure provisions such as the one in the NDA, and the Court finds none. Accordingly, the Court finds that they are reasonable in duration.

Defendants argue that the scope of the non-competition agreement is unreasonable because it applies "anywhere in the world related to [Plaintiff's] joint, syphon, and steam drying technology," among other technologies of Johnson. (Rec. Doc. 259, Ex. A, Ex. 3, ¶ 4.1). As explained earlier, the non-solicitation provision is not geographically limited, but it is limited through its "Existing Customer" definition. (Rec. Doc. 259, Ex. A, Ex. 3, ¶ 5.1). In addition, Defendant does not contend that its scope is unreasonable. Nor is the non-disclosure provision limited in geographic scope, but again, Defendant does not contend that its scope is unreasonable. As for the scope of the non-competition provision, it is not unreasonable because it is undisputed that Plaintiff has operations in multiple states and abroad. Where an employer has business interests throughout the world, a non-competition agreement without a specified geographic scope is not unreasonable. *See Superior Consulting Co., Inc. v. Walling*, 851 F. Supp. 839, 847 (E.D. Mich. 1994) (citing *Sigma Chemical Co. v. Harris*, 586 F. Supp. 704, 710 (E.D. Mo. 1984); *Superior Consultant Co., Inc. v. Bailey*, 2000 WL 1279161 (E.D. Mich. 2000) (finding that absence of a geographical restriction in non-compete agreement was reasonable); *Lowry Computer Products, Inc. v. Head*, 984 F. Supp. 1111, 1116 (E.D. Mich. 1997). Further, the scope is limited by the types of products to which it applies, and in the case of the non-solicitation provision, to the types of potential customers it targets. Activities that may be limited through a restrictive covenant include protecting "trade secrets, confidential information, close contact with the employer's customers or customer lists, or cost factors and pricing." *Certified Restoration*, 511 F.3d at 547 (quoting *Kelsey-Hayes Co. v. Maleki*, 765 F. Supp. 402, 407 (E.D. Mich. 1991). These activities are similar to the ones covered by the NDA. Defendants argue that the scope of activities restricted by the NDA is unreasonable because it "attempts to prohibit Defendants from contacting or doing business with the clients that they have serviced for over 75 years." (Rec. Doc. 301 at 15). Defendants cite no authority for this

13

proposition, and the Court finds none, particularly since the non-competition and non-solicitation covenants have a two-year cut-off. Furthermore, the NDA contained restrictions not by an employer on an lone employee, but rather by a business on an investor and all the businesses he controls. For these reasons, the Court finds as a matter of law that the NDA is reasonable under Michigan Compiled Law Section 445.774a(1).

### 2. Frustration of Purpose

Defendants also argue that the contract was void under the doctrine of frustration of purpose on the theory that the purpose of the NDA was for Plaintiff to provide Defendants with certain confidential technologies, and that Plaintiff failed to hand over the technologies. (Rec. Doc. 304 at 16-19). The Court disagrees.

First, the purpose of the NDA was to protect the confidentiality and use of any of Plaintiff's "Confidential Information" to which Plaintiff gave access to D'Amico and D'Amico controlled entities. (Rec. Doc. 259, Ex. A, Ex. 3, ¶¶ 1.5). The agreement states:

> Johnson desires to protect its right to keep its Confidential Information, including its joint, syphon, and steam drying technology, the Johnson Diagnosys Inc. technology and the Cavallini technology (advanced controls), from being used by D'AMICO or D'AMICO CONTROLLED ENTITIES, or from being disclosed by D'AMICO to third parties who are not entitled to access the Confidential Information.

(Rec. Doc. 259, Ex. A, Ex. 3, ¶¶ 1.5). Article 1 of the NDA defines the three categories of technology listed in paragraph 1.5. (Rec. Doc. 259, Ex. A, Ex. 3, ¶¶ 1.6-1.8). "Confidential Information" is a broader category, defined as "any and all proprietary information and non-public information related to JOHNSON, or any other entity of The Johnson Corporation organization, and their business, and shall include, but not be limited to [a list of items.]." (Rec. Doc. 259, Ex. A, Ex. 3, ¶3.2). Accordingly, the NDA did not just protect the use and confidentiality of the technologies

14

in paragraph 1.5.  Furthermore, Defendants point to no portion of the NDA that *required* Plaintiff to give access to all of its "Confidential Information," including the technologies in paragraph 1.5. Indeed, the NDA permits, but does not obligate Defendants to provide access to those three technologies.  (Rec. Doc. 259, Ex. A, Ex. 3, ¶ 2.2) ("Johnson *may* provided [sic] access to JOHNSON's joint, siphon, and steam drying technology . . ., Johnson Diagnosys Inc. technology . . ., and the Cavallini technology . . ., to Louisiana Steam Equipment Co. . . . .") (emphasis added).

Defendants point to testimony by Leerentveld for the proposition that Plaintiff was required to provide the technologies to Defendants.  In his deposition, Leerentveld did not agree that the purpose of the NDA was to provide technical programs to D'Amico, but rather, "to protect [Plaintiff] *in the event* that [Plaintiff] did provide the technical programs to Mr. D'Amico."  (Rec. Doc. 304, Ex. A, at 152) (emphasis added).  He admitted that those technologies were not provided to Defendant (Rec. Doc. 304, Ex. A, at 152), but this in no way affects Plaintiff's obligations under the contract.

Under the Michigan frustration of purpose doctrine, non-performance of a contractual obligation can be excused if the following elements are shown:

> (1) the contract must be at least partially executory; (2) the frustrated party's purpose in making the contract must have been known to both parties when the contract was made; (3) the purpose must have been basically frustrated by an event not reasonably foreseeable at the time the contract was made, the occurrence of which has not been due to the fault of the frustrated party and the risk of which was not assumed by him.

*Liggett Restaurant Group, Inc. v. City of Pontiac*, 676 N.W.2d 633, 637 (Mich. App. 2003) (citing *Molnar v. Molnar*, 313 N.W.2d 171, 173 (Mich. App. 1981)).  First, the words of the contract show that its purpose was not to provide the technologies to Defendants, but rather to protect the use and confidentiality of those technologies should Plaintiff disclose them.  Second, the plain language of the NDA demonstrates that Plaintiff could, but was not required, to give access to the technologies

to Defendants.  Therefore, it was entirely foreseeable that Plaintiff would not give such access to D'Amico.  Third, Plaintiffs argue that they *did* provide "Confidential Information" to D'Amico in the form of proprietary information it claims was confidential, including a corporate disclosure statement created when Plaintiff purchased its predecessor.  (Rec. Doc. 316 at 11; Rec. Doc. 316, Ex. E).  Defendants contend that the allegedly confidential corporate disclosure statement was not marked confidential when provided to Defendants, and that the document contains nothing about Plaintiff's confidential technologies.  (Rec. Doc. 311 at 5).  Whether or not Plaintiff actually provided Defendant with "Confidential Information" as defined by the NDA may be relevant for determining whether Defendant breached the NDA, but it is not relevant for deciding the issue at hand, that is, whether the NDA is invalid under the frustration of purpose doctrine.  Accordingly, Defendants' frustration of purpose defense fails.

**D. The Validity of the NDA Under Louisiana Law**

    1. <u>The NDA Under La. R.S. § 23:921</u>

    Even if Louisiana law applied, it would not invalidate the NDA covenants.  Louisiana Revised Statute Section 23:921 voids non-competition agreements unless they fall under a number of exceptions in the statute.  La. R.S. § 23:921.  The Louisiana Supreme Court has held that it applies only to employer-employee contracts, and that non-competition and non-solicitation agreements are permitted "between two corporations on equal footing."  *Louisiana Smoked Products, Inc. v. Savoie's Sausage and Food Products, Inc.*, 696 So. 2d 1373 (La. 1997).  Such covenants are also authorized in other non employer-employee contexts.  For instance, in *Winston v. Bourgeois, Bennett, Thokey and Hickey*, the court found that La. R.S. § 23:921 did not apply to non-competition provision in partnership agreement.  432 So. 2d 936, 940 (La. App. 4 Cir. 1983).

16

In holding that the statute was inapplicable, the *Winston* court reasoned that the policy behind the statute is to counteract "'the disparity in bargaining power, under which an employee, fearful of losing his means of livelihood, cannot readily refuse to sign an agreement which, if enforceable, amounts to his contracting away his liberty to earn his livelihood in the field of his experience except by continuing in the employment of his present employer.'" *Winston*, 432 So. 2d at 940 (quoting *National Motor Club of La., Inc. v. Conque*, 173 So. 2d 238, 241 (La. App. 1965).

The Court has found that D'Amico was not an employee of the Regional Center based on the plain language of the NDA, the BA, and Schedule 2.6 of the OA. Furthermore, D'Amico does not claim he was an employee of Plaintiff's, but only one of the Regional Center. Thus, the Court now finds there is insufficient evidence of an analogous employer-employee "disparity" between D'Amico and Plaintiff that would trigger La. R.S. § 23:921 and invalidate the restrictions in the NDA.


2. <u>Whether Plaintiff's Failure to Provide Certain Confidential Technologies Vitiated Defendants Consent to the NDA</u>

Defendants also contend that the NDA should be rescinded under Louisiana Civil Code Article 1949 because Plaintiff failed to perform under the contract by not handing over some of the confidential technologies listed in paragraph 1.5 and defined in paragraphs 1.6 through 1.8. (Rec. Doc. 301 at 12). Under the Louisiana Civil code, "Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party." LSA-C.C. Art. 1949.

The Court disagrees for the same reasons that it dismissed Defendants' frustration of purpose defense under Michigan law. In particular, the NDA does not obligate Plaintiff to give access to the

three technologies in paragraph 1.5. Rather, it gives Plaintiff the option to do so. Therefore, even if Plaintiff failed to do so, and failed to provide information covered by the definition of "Confidential Information," which the Court declines to decide, Plaintiff would not have committed an "error" under Article 1949, and the NDA is not invalid under that provision.

**E. The NDA's Applicability to the MAA**

While Defendants maintain that Louisiana law applies for determining whether the NDA is valid, they do not contest that Michigan law applies for deciding whether the NDA was extinguished by the BA and whether the NDA affected any agreements besides the OA. When determining the meaning of a contract, courts "give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument. *Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 28 (Mich. 2005) (citing *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776 (Mich. 2003). Courts must enforce "the intent of the parties based on the plain language of the agreement." *Harbor Park Market, Inc. v. Gronda*, 743 N.W.2d 585, 588 (Mich. App. 2007). "Contractual language is given its ordinary and plain meaning, and technical and constrained constructions are avoided." *G & A Inc. v. Nahra*, 514 N.W.2d 255, 330 (Mich. App. 1994) (citing *Bianchi v. Auto. Club of Michigan*, 467 N.W.2d 17, 20, n. 1 (Mich. 1971)). Every word must be given weight, and "courts cannot simply ignore portions of a contract in order to avoid a finding of ambiguity or in order to declare an ambiguity." *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003). The meaning of a term is a question of law when its language is unambiguous. *Conagra, Inc. v. Farmers State Bank*, 602 N.W. 2d 390, 401 (Mich. App. 1999).

When the meaning of a contract term is ambiguous, courts may look to extrinsic evidence to determine the meaning of that term. A contract is ambiguous "when its provisions are capable

of conflicting interpretations." *Universal Underwriters Ins. Co. v. Kneeland*, 628 N.W.2d 491, 494

(Mich. 2001). Whether a contractual term is ambiguous is a question of law for the court. *Port*

*Huron Educ. Ass'n MEA/NEA v. Port Huron Area Sch. Dist.*, 550 N.W.2d 228, 237 (Mich. 1996).

Where the court determines that a term is ambiguous, the meaning of the term is a question of fact.

*Port Huron*, 550 N.W.2d at 237. The meaning of the term turns on "the purpose of the contract as

a whole, the rules of contract construction, and extrinsic evidence of intent and meaning." *Klapp*,

663 N.W. at 454.

Defendants' main argument is that the BA, executed December 20, 2006, extinguished not

only the OA, but also the NDA. They contend that the restrictions on competition and solicitation

ended two years after the BA was signed, that is, December 20, 2008, on the ground that the NDA

related only to the OA and not to any other ongoing agreements between Plaintiff and Defendants.

Plaintiff argues that the NDA applied not just to the OA, but to all agreements between Plaintiff and

Defendants, including the MAA, which the parties agree was terminated on January 16, 2010.

Plaintiff contends that the NDA's restrictions on competition and solicitation ended two years after

the last of the agreements between Plaintiff and Defendants was terminated, that is, January 16,

2012, and that the non-disclosure provision never ended.

The non-disclosure provision of the NDA states:

> D'AMICO and the D'AMICO CONTROLLED ENTITIES' obligation to preserve the
> confidentiality of each item of Confidential Information disclosed hereunder *shall never*
> *terminate*, notwithstanding the termination of all the agreements between JOHNSON or any
> other entity of the Johnson Corporation organization and D'AMICO or any D'AMICO
> CONTROLLED ENTITY.

(Rec. Doc. 259, Ex. A, Ex. 3, ¶ 3.3) (emphasis added). The non-competition provision states:

> During the period that *any agreement* exists between JOHNSON or any entity of The
> Johnson Corporation organization, including the REGIONAL CENTER, and D'AMICO or
> any D'AMICO CONTROLLED ENTITY, and for a period of two (2) years following the

termination of *all such agreements*, (for any reason and whether with or without cause), D'AMICO and the D'AMICO CONTROLLED ENTITIES shall not engage in any of the following activities: ....

(Rec. Doc. 259, Ex. A, Ex. 3, ¶ 4.1) (emphasis added).  The non-solicitation reads:

During the period that *any agreement* exists between JOHNSON or any other entity of The Johnson Corporation organization, including the REGIONAL CENTER, and D'AMICO or any D'AMICO CONTROLLED ENTITY, and for a period of two (2) years following the termination of *all such agreements*: . . . .

(Rec. Doc. 259, Ex. A, Ex. 3, ¶ 5.1).

The "any" and "all" language in paragraphs 3.3, 4.1, and 5.1 of the NDA is unambiguous. *Sifers v. Horen*, 188 N.W.2d 623, 624, n.2 (Mich. 1971) ("The word 'any' means just what it says. It includes 'each' and 'every.'") (citing *Harrington v. Inter-State Business Men's Accident Assoc.*, 178 N.W. 19 (Mich. 1920).  There is no dispute that the MAA was an agreement between the parties when the NDA was made.  The Court is unpersuaded that such an interpretation is absurd because it would mean that even an agreement between the parties to have a cup of coffee (Rec. Doc. 259-1 at 31) or purchase 20 pairs of tennis shoes (Rec. Doc. 259, Ex. C, at 168-169) would be covered by those three portions of the NDA.  Such a result would not reflect an objectively reasonable interpretation of the parties' intent.  Defendants have not pointed to any other agreements between them and Plaintiff.  The parties do not dispute that the only agreements between the parties during the relevant time in this case were the MAA, the OA, the NDA, and the BA.  Defendants argue that the NDA had no bearing on the MAA because the NDA does not refer to the MAA.  The phrases "any agreement" and "all agreements," however, indicate that the parties were referencing the MAA because it was an agreement between the parties in existence at the time the NDA was executed. Therefore, the MAA was covered by the NDA.

The next question is whether the BA extinguished the NDA such that the NDA had no effect

beyond December 20, 2008, two years after the end of the OA, or whether the NDA survived until

January 16, 2012, two years after the end of MAA, the last remaining agreement between the parties

at the time. The "Entire Agreement" provision of the BA states:

> This Agreement constitutes the full and complete agreement of the parties with respect to the subject matter of this Agreement and modifies and supercedes *all prior writings, including* the Operating Agreement and all amendments thereto, orally or written. This Agreement constitutes an amendment to the Operating Agreement. To the extent any provision of this Agreement is inconsistent with any provision of the Operating Agreement, the parties hereto agree that the Operating Agreement shall be deemed modified to make the transactions contemplated in this Agreement consistent with the Operating Agreement.

(Rec. Doc. 259, Ex. A, Ex. 4, ¶ 6.6). This provision is capable of differing interpretations.

Defendants contend that "all prior writings" covers all prior writings that are related or of the same

subject matter as the OA. Plaintiffs argue that the writings following the term "including" are the

only writings that are superseded by this paragraph. Thus, the Court can look to extrinsic evidence

to determine the meaning of paragraph 6.6 of the BA.

However, as an initial matter, the Court notes that Plaintiff's argument is stronger, based

solely on the language of the contract. First, paragraph 6.6 of the BA does not mention any other

agreements other than the OA by name, suggesting that it intended only to extinguish the OA.

Second, the OA is referenced extensively in the BA, and it is undisputed that the purpose of the BA

was for Plaintiff to purchase D'Amico's interest in the Regional Center, the joint venture that was

created by the OA. Defendants argue that paragraph 4.3 of the BA, which conserved the non-

disclosure and non-competition provisions of the *OA*, suggests that if the parties had intended to

preserve the non-disclosure, non-competition, and non-solicitation provisions of the *NDA*, they

would have included a provision analogous to paragraph 4.3 explicitly preserving those provisions.

However, again, the BA does not reference the NDA, and the parties' great care in specifying when

they were referring and citing to the OA indicates that they did not intend for paragraph 6.6 to

supersede the NDA.

Because paragraph 6.6 of the BA is capable of different interpretations, the Court looks to extrinsic evidence to determine its meaning. Defendants argue that deposition by Leerentveld, the signatory of the NDA for the Plaintiff, indicates that the NDA was related to the OA to the point that the NDA was covered by paragraph 6.6 of the BA. Leerentveld testified that he would not have entered into the NDA had he not entered into the OA creating the Regional Center. (Rec. Doc. 259, Ex. B, at 58). This statement suggests that the OA was a necessary, but not sufficient prerequisite for signing the NDA. Dechnik, who was also involved in negotiating the NDA, testified that the NDA was "obviously tied" to the formation of the Regional Center. (Rec. Doc. 259, Ex. C, at 169). However, this is not inconsistent with the NDA being tied to other agreements besides the OA Defendants present no evidence explaining the need for two separate agreements, if they intended the NDA to be merely a part of the OA and not affect other agreements. Nor do they explain why the NDA was not specifically mentioned in paragraph 6.6 of the BA or anywhere in the BA, whereas the OA is referenced throughout. Courts may find that an agreement is incorporated into another agreement only upon a showing of clear intent by the parties. *NILAC Int'l Mktg. Group v. Ameritech Servs.*, 362 F.3d 354, 358, n. 3 (6th Cir. 2004) (citing *Forge v. Smith*, 580 N.W. 2d 876, 882, n. 21 (Mich. 1998). In this case, there is insufficient evidence of such intent to incorporate the NDA into paragraph 6.6 of the BA.

For the same reasons, the Court is not persuaded that the Mutual Release provision of the BA covered the NDA. It states:

> Except with respect to the representations, warranties, indemnities and covenants contained in this Agreement, on the Closing Date, each of KJI [Kadant] and JVD [D'Amico] releases the other party from any and all claims the releasing party ever had, now or hereafter can, shall, or may have against the other for, upon, or by reason of: any matter, cause, or thing whatsoever related to the formation or operation of KJSE [the Regional Center] to the date

of this Agreement, without regard to when such claims arose, arises, or is discovered.

(Rec. Doc. 259, Ex. A, Ex. 4, ¶ 3.5). Defendants claim that Plaintiff's instant action for breach of the NDA is barred by paragraph 3.5 of the BA because it is "related to the formation or operation" of the Regional Center. Plaintiff contends that the NDA is not related to the formation or operation of the Regional Center to the extent it affects agreements other than the OA, such as the MAA.

Paragraph 3.5 of the BA could mean that it releases all claims arising out of the portions of the NDA that covers or relates to the OA, regardless of whether they also cover other agreements. On the other hand, it could mean that it releases all claims arising out of the NDA, but only as they relate to the OA. Although the NDA was tied to the OA, it was also tied to other ongoing agreements between the parties, such as the MAA. Accordingly, the Court finds as a matter of law that Plaintiff's claims arising out of the NDA with respect to the MAA were not extinguished on December 20, 2008; that the NDA's non-competition and non-solicitation provisions remained in force until January 16, 2012, and that its non-disclosure provision remains intact.

**F. Liquidated Damages Clause**

Defendants contend that the liquidated damages clause of the NDA is unreasonable and therefore unenforceable. It states:

> It is agreed that no exact measure of the damage to be caused to JOHNSON, its subsidiaries and affiliated companies, including the REGIONAL CENTER, by a breach of D'AMICO's covenants contained herein can be determined, and for the purpose of liquidating the amount of damages, and not as a penalty, it is agreed that in case of each breach by D'AMICO or any D'AMICO CONTROLLED ENTITY of this Agreement, the damages caused shall be and are fixed, liquidated and determined at the sum of Two Hundred Fifty Thousand Dollars ($250,000). JOHNSON is given the right to recover the sum from D'AMICO and from any D'AMICO CONTROLLED ENTITY by appropriate action in any court of general jurisdiction, in case of any breach of this agreement.

(Rec. Doc. 258, Ex. A, Ex. 3, ¶ 6.2). While this clause states that the damages are not a penalty,

Dechnik, CFO of Plaintiff, testified that it "would be the penalty for each violation of either the nondisclosure, noncompete, or nonsolicitation areas of the agreement . . . ." (Rec. Doc. 301, Ex. B, at 88). He also testified that it would be a "deterrent." (Rec. Doc. 301, Ex. B, at 91). Finally, he testified that he thought "it would be a good deterrent," as opposed to numbers as low as 20,000 or 30,000, but that besides the business determination that $200,000 to $300,000 was an adequate range, there was "no real reason" to choose $250,000. (Rec. Doc. 301, Ex. B, at 91).

Defendants agree that Michigan and Louisiana law are similar with respect to liquidated damages. Accordingly, and because the Court has determined that Michigan law applies in this dispute, the Court will analyze the clause only under that state's laws. Michigan courts honor liquidated damages clauses unless they are clearly unreasonable when considering the actual damages sustained by the breached-against party. *Curran v. Williams*, 89 N.W.2d 602, 605 (1958) ("[C]ourts . . . will disregard the express stipulation of the parties, *only* in those cases where it is obvious from the contract before them, and the whole subject matter, that the principle of [just compensation for the loss actually sustained] has been disregarded, and that to carry out the express stipulation of the parties, would violate this principle . . . .") (emphasis in original). Evidence of the actual injury sustained is not necessary for determining whether the clause is reasonable. *Curran*, 89 N.W.2d at 604 ("If the amount stipulated is reasonable with relation to the *possible* injury suffered, the courts will sustain such a stipulation.") (emphasis added).

Plaintiff's expert report indicates that the Regional Center solicited many contracts that exceeded $250,000 during its operation. (Rec. Doc. 312, Ex. C, at 3-5). Accordingly, it is possible that a single breach of the non-competition, non-solicitation, and non-disclosure provisions of the NDA could have resulted in a $250,000 loss for Plaintiff. Defendants present no evidence countering this figure; instead they make the conclusory statement that $250,000 is excessive and

"bears no relation to the alleged, possible injury suffered by Plaintiff." (Rec. Doc. 301 at 24).
Accordingly, the Court finds that the liquidated damages clause is not unreasonable as a matter of
law.

Accordingly,

IT IS ORDERED that Motion for Partial Summary Judgment filed by Defendants is
DENIED. (Rec. Doc. 259).

IT IS FURTHER ORDERED that Motion for Partial Summary Judgment filed by Plaintiff
is GRANTED. (Rec. Doc. 265).

IT IS FURTHER ORDERED that Motion for Partial Summary Judgment filed by Defendant
is DENIED. (Rec. Doc. 304).

New Orleans, Louisiana, this 8th day of May, 2012.

**HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**