**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **KADANT JOHNSON, INC.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 10-2869 c/w 11-36** |
| | *Pertains only to 10-2869* |
| **JOSEPH V. D'AMICO, LOUISIANA STEAM** | **SECTION "C" (2)** |
| **EQUIPMENT, LLC and UTILITIES** | |
| **OPTIMIZATION GROUP, LLC** | |

**ORDER & REASONS**

This matter was tried on the issue of liability before the Court, without a jury, from June 11 through June 28, 2012, and taken under advisement on June 28, 2012.  (Rec. Doc. 640).  Having considered the evidence and the testimony adduced at trial, the record, the post-trial memoranda of counsel, and the law, the Court now issues its opinion.

**I. BACKGROUND**

This case involves two companies, Plaintiff Kadant Johnson, Inc. ("Kadant") and Defendant Louisiana Steam Equipment, LLC ("LSE"), as well as Defendant Utilities Optimization Group ("UOG"), which manufactures, installs, and services equipment for LSE, and Defendant Joseph D'Amico ("D'Amico"), who is the president and owner of LSE, and the Chief Executive Officer ("CEO") and owner of UOG, (collectively, "Defendants").  Kadant and LSE have maintained a business relationship in the paper industry since the 1930s.  Plaintiff claims that Defendants breached four (4) contracts:

(1) two Manufacturer's Agent Agreements (collectively, "MAAs") signed on May 14, 1993 and terminated on January 16, 2010, wherein LSE sold Kadant's product within a designated territory.[1] (Tr. Exs. 240, 241). Kadant claims that Defendants breached both the "solicitation" and the "representation" clauses of Section 5.04 of the MAAs when they allegedly solicited orders from alleged Kadant customers and used Kadant product numbers as part of Defendants' numbering of non-Kadant parts. Kadant also claims that Defendants violated the confidentiality clause of Section 4.06 by disclosing and using in direct competition items – drawings, dryer studies, and price lists – that Plaintiffs allege were confidential.

(2) the Post-MAA Termination 10% Agreement ("10% Agreement"), created on January 20, 2010, wherein Kadant agreed to sell products to Defendants at a 10% discount following the termination of the MAAs. (Tr. Exs. 102, 258). The agreement to sell at a discount ended in June 2010, when Kadant stopped selling discounted parts to Defendants. ((Tr. Ex. 226) (October 30, 2010 email from Eklund to Georgia-Pacific Monticello representatives and Kadant employees indicating that Kadant "discontinued selling parts to [LSE] in May/June 2010"); (Tr. V at 229-232) (Eklund testimony not disputing that LSE bought $1.5 million worth of Kadant products through June 2010)). Defendants continued to sell the parts it had bought under the 10% Agreement through September 2010. (Tr. Ex. 887). Kadant claims that Defendants breached this agreement because Defendants sold the discounted products to customers allegedly not covered by the agreement and because they failed to truthfully inform Kadant of the identity of customers to whom they sold Kadant products under the agreement.

---

[1]The operative language of both agreements for purposes of this opinion is the same in both MAAs.

(3) the Non-Competition, Non-Solicitation, and Non-Disclosure Agreement ("NDA") executed on August 6, 1999 and terminated on January 16, 2010, which restricted Defendants' activities under conditions detailed more fully below.  (Tr. Ex. 244).  D'Amico signed this agreement individually and as agent for LSE.  (Tr. Ex. 244 at 9).  Kadant claims that Defendants breached the non-competition, non-solicitation, and non-disclosure articles of the NDA for alleged activities between the termination of the MAAs until October 2010.

Also before the Court are Defendants' counterclaims against Kadant for defamation, tortious interference, unfair trade practices, and breach of the non-disparagement clause of the December 20, 2006 Buyout Agreement, wherein Kadant bought all of Defendants' interest in a joint venture they had created under the August 6, 1999 Operating Agreement.  (Rec. Doc. 259-3, Ex. A-4, ¶ 4.4).  The main basis for these claims are Kadant's alleged statements to Defendants' customers that Defendants were selling parts that Defendants falsely represented were Kadant parts when in fact the parts were "pirated" or "counterfeit" parts manufactured by companies other than Kadant.

On May 28, 2010, LSE and D'Amico filed a declaratory action against Kadant in this Court, seeking declarations related to the agreements described above.  (Case No. 10-1600, Rec. Doc. 1).  That case was dismissed on August 31, 2010.  (Case No. 10-1600, Rec. Doc. 16).  On June 21, 2010, Kadant filed suit in Alabama state court against Defendants, making breach of contract and other claims that were later amended several times. (Rec. Docs. 1-8, 22, 73, 242).  Defendants then filed counterclaims and amended counterclaims against Plaintiff.  (Rec. Docs. 3, 75).  Defendants removed the suit to the Middle District of Alabama on July 6, 2010 (Rec. Doc. 1-2), and then filed a motion to transfer the suit to the Eastern District of Louisiana on the ground that their declaratory action was ongoing in this Court.  (Rec. Docs. 1-6, 1-7).  That motion was granted, and the suit was eventually transferred to this Court on September 8, 2010.  (Rec. Docs. 1-29, 5).  On September 30,

3

2010, Kadant filed a second suit against Defendants in the Western District of Michigan, this time bringing patent, copyright, and trademark infringement claims related to products Defendants sold during the existence of the aforementioned agreements. Defendants filed a motion to transfer, and the case was transferred to the Eastern District of Louisiana on January 14, 2011. (Case No. 11-36, Rec. Docs. 8, 28, 29). This second case was consolidated with the instant case on January 18, 2011. (Rec. Doc. 34). At the eve of trial, on June 8, 2012, after approximately a year and a half of litigation in both suits, the parties settled the second suit and settled some of the claims in the instant suit. Accordingly, the only remaining claims are Kadant's claims for breach of the MAAs, the 10% Agreement, and the NDA, and Defendants' counterclaims for defamation, tortious interference, unfair trade practices, and breach of the Buyout Agreement.

## II. FINDINGS of FACT and CONCLUSIONS of LAW

The Court heard testimony from twenty-seven (27) witnesses: (1) Carl Howe, Kadant's vice president of sales (Tr. I, 6/18/12, Rec. Doc. 644 ("Tr. I") and Tr. II, 6/19/12, Rec. Doc. 658 ("Tr. II")); (2) Dennis Moon, who has worked as a director of finance and controller for Kadant (Tr. II); (3) Kenneth Hill, an engineer and Kadant's systems group president (Tr. II); (4) Alan Ives, an engineer and Kadant's director of product development (Tr. III, 6/20/12, Rec. Doc. 645 ("Tr. III")); (5) Gerald Timm, an engineer and Kadant's vice president of corporate engineering (Tr. III); (6) John Hotovy, a field service engineer for Kadant (Tr. III); (7) Sue-Anne Pierce, Kadant's systems development manager in Houston, Texas (Tr. III); (8) Todd Martin, UOG's executive vice president (Tr. III); (9) Jeffrey Downs, a plant engineer that designs and installs equipment for RockTenn, formerly known as Smurfit Stone (Tr. IV, 6/21/12, Rec. Doc. 646 ("Tr. IV")); (10) Sam Canatella, LSE's operations manager of inside sales (Tr. IV); (11) Tim DeFrance, a sales engineer for LSE (Tr.

4

IV); (12) John Monteith, a district sales manager for Kadant (Tr. IV); (13) John Picone, LSE and UOG's controller (Tr. IV); (14) Chris Norris, a sales engineer for LSE (Tr. V, 6/22/12, Rec. Doc. 147 ("Tr. V")); (15) Joseph Canale, LSE's director of sales, pulp and paper division since mid-2010 and a former sales engineer for LSE (Tr. V); (16) Robert Logan, Jr., owner of Process Systems, Inc., a representative for Deublin, Corp., which is a competitor to Kadant (Tr. V); (17) John Eklund, Kadant's regional sales director for the South and Southeast group of the Paperline group (Tr. V); (18) Brian Card, Kadant's systems development manager in Vancouver, Washington since 2012 and former manager of day-to-day operations of the No. 20 paper machine at Georgia Pacific Camas (Tr. VI, 6/25/12, Rec. Doc. 648 ("Tr. VI")); (19) Paul Cornelison, a reliability engineer for Graphic Packaging International (Tr. VI); (20) Robert Tully, LSE's director of corporate sales (Tr. VI); (21) Joseph D'Amico, owner and president of LSE and owner and CEO of UOG (Tr. VI, Tr. VII, 6/26/12, Rec. Doc. 649 ("Tr. VII"), and Tr. IX, 6/28/12, Rec. Doc. 651 ("Tr. IX")); (22) Larry LeBlanc, a maintenance planner for the No. 2 paper machine for International Paper (Tr. VII); (23) Robert Eckhoff, a former reliability engineer for International Paper (Tr. VII); (24) James Dechnik, Kadant's former treasurer, vice president of finance, chief financial officer and chief operating officer (Tr. VII); (25) William Rabby, Clearwater Paper Wiggins's safety manager (Tr. VII); (26) Don Lasseigne, Superior Fabricators's former purchasing, safety, environmental and office manager (Tr. VII); and (27) Gregory Wedel, Kadant's former vice president of marketing and technology and current vice president and manager (Tr. Tr. VII and Tr. VIII, 6/27/12, Rec. Doc. 650 ("Tr. VIII")).

In addition, depositions from two (2) witnesses were admitted into the record: Rudolph Leerentveld, former president and CEO of Kadant (Rec. Doc. 642-1), John Peter, a research engineer for Kadant (Rec. Doc. 639).

### A. Credibility of Witnesses

In its Post-Trial Brief on Remaining Issues of Liability, Kadant asks the Court to draw negative inferences about D'Amico's credibility on several grounds. (Rec. Doc. 674 at 22-26). The Court dismisses these arguments. First, Kadant argues that D'Amico's testimony is biased because he has a stake in the outcome of the proceedings personally and as owner of LSE and UOG. Although none of Kadant's witnesses were sued in their personal capacity, most of them are Kadant employees and therefore may have a personal interest in the outcome. Accordingly, bias is an issue for both sides and thus the argument is largely moot.

Second, Kadant maintains that D'Amico and his companies are biased because their involvement in unrelated litigation suggests that they are strapped for cash, especially in the context of "these trying economic times," and therefore that they would benefit from a favorable decision in this case. (Rec. Doc. 674 at 23, note 9). This improper contention is so removed from the issues at stake in the instant case that the Court declines to address it.

Third, Kadant asks the Court to draw negative inferences from D'Amico's testimony under *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 1060, 2071 (2011) because he failed to inform his employees of the NDA or its terms. The facts in *Global-Tech* are not analogous to those in this case. There, the president of company A, which sought to copy company B's device, failed to inform company A's own attorney that the device was a copy of company B's device. This was one of several factors that led the court to infer that the purpose of company A's president's omission was to "manufacture a claim of plausible deniability in the event that his company was later accused of patent infringement." *Global-Tech*, 131 S. Ct. at 2071. Here, Kadant does not dispute that D'Amico informed his attorneys of the NDA or any other agreement at issue. Furthermore, the NDA contains no requirement that D'Amico inform his employees of its existence, and Kadant has

6

shown no evidence that D'Amico was otherwise obligated to do so.  Therefore, the Court will not draw negative inferences on this ground.

Fourth, Kadant urges the Court to "remember the marked difference in the testimony by D'Amico during the first phase of his testimony at trial as compared to the approach after breaks were taken during the trial (and apparent consultations with his counsel)."  (Rec. Doc. 674 at 26) (citation omitted).  Kadant provides not a single example of such differences, indicating that it prefers not to "itemize all of the numerous instances of D'Amico's dissembling[.]"  (Rec. Doc. 674 at 26).  The Court declines to address this point as well, as Kadant's references and their relevance to the issues in this case are entirely unclear.

### B. Discovery Disputes

Kadant complains that Defendants failed to produce documents during discovery and therefore that the Court should draw negative inferences on the evidence adduced at trial.  The Court is unconvinced for several reasons.  First, the argument is untimely.  The deadline for resolving discovery disputes occurred before trial.  Second, discovery disputes were fully addressed by the Magistrate Judge at the pretrial stage of this case.  In particular, the Magistrate Judge ruled that Defendants' responses to Kadant's Request No. 53, which Kadant alleges was incomplete, were sufficient.  (Rec. Doc. 212 at 2).  Kadant did not appeal that Order.  Accordingly, it stands.  Third, it is unclear what precise negative inference Kadant seeks.  For these reasons, Kadant's request for negative inferences due to alleged discovery violations is dismissed.

### C. Kadant's Claims for Breach of the MAAs and the Post-MAAs 10% Agreement

On May 14, 1993, Johnson Corporation (Kadant's predecessor) and LSE entered into two Manufacturer's Agent Agreements ("MAAs").  (Tr. Exs. 240, 241).  The MAAs provided that LSE would act as a sales representative within a delimited territory for Kadant's products, with

7

one MAA focusing on paper products (Tr. Ex. 241) and the other focusing on products related to the industrial markets. (Tr. Ex. 240).  Kadant gave notice to LSE that it was terminating the MAAs on November 13, 2009, with termination effective on January 16, 2010 (Tr. Ex. 4).  Days after the MAAs were terminated, on January 20, 2010, the parties made an agreement under which Kadant would sell parts to Defendants at a 10% discount.  (Tr. Ex. 12).  The terms of both agreements are contested.  The parties do not dispute that Michigan law applies to interpretation of the MAAs and the 10% Agreement.

Courts must enforce "the intent of the parties based on the plain language of the agreement."  *Harbor Park Market, Inc. v. Gronda*, 743 N.W.2d 585, 588 (Mich. App. 2007).  Interpretation of a contract is limited to the words used when the words are clear and unambiguous.  *See Universal Underwriters Ins. Co. v. Kneeland*, 628 N.W.2d 491, 496 (Mich. 2001).  A contract is ambiguous "if its provisions may reasonably be understood in different ways."  *Universal Underwriters*, 628 N.W.2d at 496 (citing *Farm Bureau Ins. Co. v. Nikkel*, 596 N.W.2d 915, 919 (1999)).  Whether or not a term is ambiguous is a question of law for the court. *Conagra, Inc. v. Farmers State Bank*, 602 N.W.2d 390, 401 (Mich. App. 1999).  If a term is ambiguous, the Court may rely on extrinsic evidence to interpret that term.  *See Thompson v. Farm Bureau Ins. Co.*, 2008 WL 2697399 (Mich. App. 2008); *City of Gross Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005) (quoting *New Amsterdam Cas. Co. v. Sokolowski*, 132 N.W.2d 66, 68 (1965) ("'[i]f [the language of the contract] is ambiguous, testimony may be taken to explain the ambiguity.'").

1. <u>Section 5.04 of the MAAs</u>

Kadant first alleges that Defendants violated both the "solicitation" and "representation" clauses of Section 5.04 of the MAAs.[1]  They read:

> Promptly upon termination of the agreement, the MANUFACTURER'S AGENT shall immediately and forever cease to solicit orders from JOHNSON customers or represent in any way that it is associated with JOHNSON.  JOHNSON agrees to repurchase any inventory held by the MANUFACTURER'S AGENT at termination for cost provided such devices are neither obsolete or special order.

Tr. Exs. 240, § 5.04; 241, § 5.04.

Kadant claims that LSE violated the "solicitation" clause of Section 5.04.  The plain meaning of the Section forbids Defendants, upon termination of the MAAs, from (1) soliciting orders from Kadant customers or (2) representing that they are associated with Kadant.  The parties do not dispute the meaning of the term "solicit."  However, Kadant argues that the solicitation clause of Section 5.04 prohibited Defendants from soliciting anything at all from Kadant customers, while Defendants maintain that the clause restricted them from soliciting the types of orders at issue in the MAAs.

The Court adopts the latter interpretation.  The meaning of "orders" must be read within the context of the types of products covered by the MAAs and in conjunction with the meaning of "customer."  The MAAs provide that LSE would sell Kadant products listed in Schedule A of each agreement, titled "Devices Covered by this Agreement," including "All Johnson Rotary Pressure Joints and Compensators; All Syphon Devices and ancillary equipment such as: flanges, brackets, spiders, etc.; Sight Flow Indicators; Flexible Hose [sic]; Separators; Cylinder

---

[1] Defendants complain that Kadant's claims for breach of the MAAs are not before this Court as they were not part of the original pretrial order.  (Rec. Doc. 678 at 3, note 1).  The Court is unpersuaded.  The joint pretrial order was amended several times because it did not comply with the Court's requirements.  Accordingly, the third and final pretrial order is the governing one in this case.  (Rec. Doc. 623).  That version includes Kadant's claims for breach of the MAAs.  (Rec. Doc. 623 at 16-17).  Therefore, these claims are properly before the Court.

and Solenoid Valves; All Liquid-Movers (condensate pumping equipment); Liquid Level

Controls; Vacuum Breakers; Dryer Bars and Insulation Profiling Equipment."  (Tr. Exs. 240,

Schedule A, 241, Schedule A).  The Court finds that "orders" in Section 5.04 were restricted to

orders of these devices.

 Additionally, the Court does not find that the solicitation clause covers orders from

customers that purchased Kadant products from LSE on the ground that those customers were

solely Kadant's customers.  There is insufficient evidence to aid the Court in determining when

an entity was a customer of Kadant's and not one of LSE's and vice-versa.  The MAAs

themselves do not define the word "customer."  Kadant maintains that the mills that purchased,

installed, and used Kadant products were "without doubt customers of Plaintiff" (and that

therefore, LSE was forbidden from contacting them following the termination fo the MAAs)

because LSE did not have "manufacturing capabilities for the products identified in Schedule A

of the MAAs."  (Rec. Doc. 674 at 5).  Kadant points to no language in the MAAs demanding

such a conclusion.

 Given this absence in the text, the Court relies on extrinsic evidence.  D'Amico testified

that he considered, and he believed that LSE purchasers considered, that LSE purchasers were

customers of LSE.  When asked if he interpreted Section 5.04 to mean that "you would not be

able to contact your customers to sell competing type products if Kadant, or Johnson at that time,

decided that they no longer wanted you as a representative," D'Amico replied "No."  (Tr. IX at

32-33).  Furthermore, Rudolph Leerentveld, former president and CEO of Kadant, testified in his

deposition that Manufacturer's Agents such as LSE "would sell to their customer base, and that

process would continue, even if a Johnson contract would have been terminated."  (Rec. Doc.

638 at 6: Leerentveld Depo at 17).  Thus, a former Kadant leader himself admitted that Section

5.04 did not prevent LSE from contacting customers to whom it had previously sold Kadant products.  Indeed, Kadant in its own Post-Trial Brief on Remaining Issues of Liability acknowledges that mills that bought Kadant products through LSE could be considered both Kadant's customers and LSE's customers.  (Rec. Doc. 674 at 6).

Kadant's interpretation would prevent LSE from ever contacting, for any business whatsoever, companies to whom it had once sold Kadant products.  Kadant argues that although the MAAs do not limit the duration of Section 5.04, the Court may limit it to five (5) years under Michigan law.  (Rec. Doc. 674 at 4).  The Court agrees that it has this power.  *See Merrill Lynch, Pierce, Fennder & Smith Inc. v. Ran*, 67 F. Supp. 2d 764, 773 (E.D. Mich. 1999)(indicating that when a non-solicitation covenant is unreasonable, courts may limit them to render them reasonable); *Great Lakes Spice Co. v. GB Seasonings, Inc.*, 2005 WL 3216222, at *2 (E.D. Mich. 2005)(enforcing a five-year covenant)).  However, given that the MAAs taken as a whole and related testimony indicate that LSE was not forbidden from contacting customers regarding orders for non-Kadant parts, the Court finds it unnecessary to exercise that power.  Under the Court's interpretation of the solicitation clause of Section 5.04, Kadant has presented no facts indicating breach.  Therefore, the Court finds that Defendants did not breach this provision.

Kadant also claims that Defendants violated the "representation" clause of Section 5.04.  The Court is unpersuaded.  First, it is undisputed that the parties entered into the 10% Agreement four days after the effective termination of the MAAs, and it is undisputed that under this agreement Kadant agreed to sell Kadant parts to Defendants at a 10% discount from Kadant's list price.  (Tr. Ex. 12).[2]  The parties contemplated that those parts would be resold by

---

[2]Trial Exhibits 12 and 258 are the same document.  The Court will cite only to Trial Exhibit 12 for ease of reference.

Defendants to "paper industry customers where LSE/UOG executes maintenance and purchase activities for customers of the previous LSE representation region defined by [the MAAs]." If Defendants did resell Kadant parts, a possibility to which Kadant agreed, it would necessarily have to represent that it was representing Kadant in some form. (Tr. Ex. 12). Thus, any statement by Defendants that they were representing Kadant when they were in fact selling a Kadant product under the 10% Agreement was not a violation of Section 5.04 of the MAAs.

Second, Kadant complains that Defendants' "U" numbering system, wherein Defendants transformed Kadant part numbers by adding a "U" prefix to non-Kadant parts intended for sale to third parties, constituted "representation" by Defendants that they were associated with Kadant, in violation of the MAA. The Court finds that Defendants' numbering system with respect to non-Kadant parts did not constitute "representation" under Section 5.04 because the "U" symbolized the association with UOG and sufficiently distinguished Defendants' products from Kadant's. If Kadant wanted Defendants to use more distinguishable labels than the ones Defendants chose, Kadant should have made that clear in the MAAs and/or the 10% Agreement. Therefore, the Court finds that Defendants did not breach the "representation" clause of Section 5.04 of the MAA through its "U" numbering system or in any other way with respect to its sale of Kadant parts or non-Kadant parts.

2. Section 4.06 of the MAAs

Plaintiff also claims that Defendants breached Section 4.06 of the MAAs, which states:

JOHNSON shall conduct advertising and furnish such privileged matter, price list and confidential information as JOHNSON shall from time to time deem expedient or necessary and shall furnish technical advice to the MANUFACTURER'S AGENT upon request. The MANUFACTURER'S AGENT agrees to keep such price list, confidential information, and technical advice confidential for the period of this agreement and for a period of five (5) years after termination of this agreement.

(Tr. Exs. 240, § 4.06; 241, § 4.06).

Kadant maintains that Defendants breached this provision with respect to three (3) types of information: drawings, dryer studies, and price lists. (Rec. Doc. 674 at 9-13). The Court finds that the drawings were not confidential under any plausible definition of that term because Kadant has not proven that third parties' access to them was restricted. (*See, e.g.*, Tr. Exs. 113, 225). The MAAs do not contain a definition of the term "confidential." Thus, the Court looks to extrinsic evidence and legal argument to construe that term. Kadant suggests that information may be considered "confidential" if it is known only to the "pulp and paper industry" but not to the "general public": "it is clear that 'general public' is not limited to the smaller universe of the 'pulp and paper industry.'" (Rec. Doc. 676 at 13). Kadant adds that Defendants do not explain the meaning of "general public," and provides a dictionary definition of the term. (Rec. Doc. 676 at 13-14). Kadant makes this argument in reference to the NDA's confidentiality provision, not the MAAs', but the Court's analysis is the same. The Court finds that information is not "confidential" under any of the agreements if it is freely disseminated in presentations to the pulp and paper industry or to Kadant product purchasers, regardless of whether they were marked "confidential." Such acts literally contradict the term "confidential."

Non-Kadant or LSE/UOG witnesses at trial testified that they were provided with such drawings. For instance, Robert Logan, owner of a company that represents a competitor to Kadant, testified that when he performs services at a mill using Kadant equipment, Kadant provides him with the relevant assembly drawings. (Tr. V at 145-146). Also, both Ken Hill, Kadant's vice president of corporate engineering, and Gregory Wedel, Kadant's vice president and manager, testified that the drawings were included in pulp and paper convention presentations. (Tr. II at 239-245; Tr. VIII at 184-190). Finally, D'Amico's presentations at

Smurfit Stone Jacksonville and Rock-Tenn Demopolis (Tr. Exs. 13, 878, 881) contained the same slides as earlier presentations made by Hill and Wedel in public forums. (Tr. Exs. 228, 882, 912). Kadant does not refute this evidence. In fact, while it maintains that the drawings were not disseminated to the general public, it essentially acknowledges that the drawings were made available to members of the paper and pulp industry: "Plaintiff's materials and confidential information were never distributed to the 'general public'; materials provided to customers, in conferences, and at trade associations clearly fall outside the definition of "general public." (Rec. Doc. 676 at 14). Even if the drawings were marked "confidential," which the Court does not specifically find, Kadant's acts with respect to the drawings indicate that they were not confidential. Accordingly, Defendants' disclosure of the drawings at issue does not constitute breach of the Section 4.06 of the MAAs.

Kadant next claims that Defendants' disclosure of dryer studies violated Section 4.06 of the MAAs. (Tr. Exs. 224, 227, 230, 231, and 350). Of note, only one of those studies contains language indicating that it confidential. (Tr. Ex. 350). Furthermore, Kadant identified one instance in which a dryer study was disclosed to a third party; specifically, LSE sales engineer Chris Norris testified that he provided a Kadant dryer study to Fulton Systems, a Kadant competitor. (Tr. V at 27). However, LSE argues that it had purchased that study and that once it had title to it, it could disclose it to whomever it pleased. Kadant does not dispute that Defendants bought that study or any other dryer study for that matter. Instead, it contends that Defendants made those purchases under confidentiality terms with the third parties that sold the studies to Defendants. (Rec. Doc. 674 at 12). This argument fails, as Kadant has shown no authority, and the Court has found none, demonstrating that it has a cause of action with respect to any confidentiality terms between Defendants and a third party. For the foregoing reasons,

Kadant has not proven that Defendants' disclosure, if any, of a dryer study, constituted a breach of Section 4.06 of the MAA.

Finally, Kadant claims that Defendants used Kadant's price lists to compete or to aid others in competing against Kadant.  Section 4.06 contains no restriction on "use" of price lists; it merely prohibits disclosure of price lists.  Accordingly, Kadant's claim for breach of Section 4.06 fails on this count as well.

3. <u>10% Agreement</u>

As stated earlier, on January 20, 2012, four (4) days after the effective termination of the MAAs, Kadant and Defendants entered into an agreement wherein Kadant would sell parts to Defendants under terms described in an email from John Eklund, Kadant's regional sales director for the South and Southeast group of the Paperline group, to other Kadant employees, including Carl Howe, Kadant's vice president of sales:

> Replacement part sales w/ 10% discount at mills where LSE has active onsite maintenance and/or procurement programs with the customer.  Since LSE/UOG have continuous onsite presence at approx. 7 mills in the South, this will encourage they use our parts vs. other supply.  This applies to only orders LSE places with us in their previous territory's mill sites.  If a customer places an order with us directly, LSE will not receive a discount or commission.  We can terminate this arrangement at any time.

(Tr. Ex. 102).  Eklund sent this email to make those Kadant employees "aware of the areas we will still collaborate [sic] with LSE."  (Tr. 102).  The email was sent approximately two (2) hours after Eklund sent an email describing these terms to D'Amico, which memorialized discussions Eklund had had with D'Amico earlier that day.  (Tr. Ex. 12).  The first email states:

> Kadant Johnson will extend a 10% discount from current List Price in effect at time of order for paper industry parts ordered by LSE for resale to paper industry customers where LSE/UOG executes maintenance and purchase activities for customers of the previous LSE representation region defined by the [paper products MAA, Tr. Ex. 241] effective January 1, 2002 (amended version).  Part orders placed directly from customers to Kadant Johnson do not qualify for discount or commission payment to LSE.  In

exchange for providing LSE with a 10% discount for paper industry parts it resells, LSE
will indicate to Kadant Johnson the intended customer for each order. This arrangement
shall continue until terminated by Kadant Johnson or Louisiana Steam Equipment
Company.

(Tr. Ex. 12).

Kadant argues that it offered testimony at trial to show that it intended, or "expected,"

Defendants to sell the discounted Kadant products "to only certain customers in the old 'LSE'

territory." (Rec. Doc. 674 at 13). Specifically, Kadant maintains that the 10% Agreement

applied only to seven (7) southern mills with whom Defendants had "maintenance contracts" and

that Defendants breached it when they involved customers outside of that group.

The preponderance of the evidence does not show that only seven (7) mills were subject

to the 10% Agreement. The two January 20, 2010 emails, which appear to be the only written

versions or explanations of the agreement at the time it was made, restrict the discount to

customers with whom "LSE has active onsite maintenance and/or procurement programs." (Tr.

Exs. 102). The second email, from Eklund to other Kadant employees, refers to "7 mills" but in

no way restricts the agreement to those mills. (Tr. Exs. 102) ("Since LSE/UOG have continuous

onsite presence at approx. 7 mills in the South, this will encourage they use our parts vs. other

supply."). The first email, from Eklund to D'Amico, does not refer to "7 mills" at all. (Tr. Ex.

12).

Further, no part of Eklund's testimony describing the 10% Agreement demonstrates that

he believed the arrangement applied only to seven (7) mills. In Howe's view, the purpose of the

agreement was "to supply parts so Louisiana Steam could maintain those – or that flow of parts

and fulfill their service obligations with those handful of southern customers in their territory."

(Tr. I at 95). Howe also stated that the agreement would be restricted to customers with whom

Defendants had "a maintenance or a procurement program." (Tr. I at 96). Todd Martin, UOG's executive vice president, testified that UOG had maintenance contracts, but that LSE did not. (Tr. III at 251). Defendants do not dispute that UOG had maintenance contracts but argue that this point is irrelevant.

The Court agrees. The 10% Agreement clearly involved both Defendants LSE and UOG, (Tr. Exs. 12, 102), and it is unclear how Martin's testimony above suggests that Defendants were in breach. In addition, Defendants correctly point out that the 10% Agreement applied not just to Defendants' maintenance programs with a given customer, but also to their procurement programs. Kadant presented no evidence that Defendants did not have applicable procurement programs. In contrast, Defendants presented evidence that they did have such programs. For instance, Logan, the owner of Process Systems, Inc., which represents a competitor to Kadant, indicated that he had a contract with LSE wherein LSE provided parts to Logan's company. (Tr. V at 142-143). Moreover, Howe admitted, in an April 16, 2010 telephone conversation with D'Amico and Eklund that once the MAAs were terminated, LSE was not "restrained by any boundaries obviously." (Tr. Ex. A, 9"09-9"15). When Howe asked D'Amico whether LSE was "offering [Kadant parts] outside of the traditional Louisiana Steam territory," D'Amico responded "No we're not, not at this point in time. We will obviously support other technology than yours if given the opportunity to do so outside of Louisiana Steam territory, but, uh, because we certainly have the capabilities to do just that." (Ex. A, 9"55-10"20). Accordingly, the Court does not find that Defendants breached the 10% Agreement on the basis that they extended the discount to customers outside of the seven mills to which Kadant claims the agreement was confined.

17

Kadant then goes on to claim that Defendants falsely represented to Kadant that they were selling products to customers among the seven (7) to which Kadant claims the 10% Agreement was restricted.  Because the Court found that the 10% Agreement was not restricted to those mills, or to mills with which Defendants had ongoing maintenance programs, it declines to address Kadant's claim in this respect.  Kadant also complains that Defendants sold Kadant products to at least one company, E.S. Constant, which then sold those products to third parties, such as Nippon Paper, which third parties were not in the former LSE territory under the MAAs. Kadant claims that Defendants somehow knew that E.S. Constant would eventually sell the parts to mills outside of the LSE territory, or alternatively, that LSE agreed to resell products purchased from Kadant to customers who would then, in turn, restrict their sales to customers within the terminated MAA territory.  It is unclear to the Court how E.S. Constant's sales could constitute a breach of the 10% Agreement by Defendants, but in any case, Kadant has provided wholly insufficient proof of these allegations.  Further, as stated earlier, Kadant's own vice president of sales admitted that "obviously" LSE was not "restrained by any boundaries" after the termination of the MAAs.  (Tr. Ex. A, 9"09-9"15).  Therefore, the Court finds that Defendants did not breach the 10% Agreement on the basis that they allegedly lied to Kadant about the eventual destination of the discounted products they purchased from Kadant.

**D. Kadant's Claims for Breach of the Non-Disclosure Agreement**

On August 6, 1999, Kadant and D'Amico as President of LSE, executed the Operating Agreement, which created the joint venture Johnson Southeast, LLC, also known as the Regional Center ("Joint Venture").  (Tr. Ex. 242).  Under the Operating Agreement, Defendants could sell

Kadant's products in an area distinct from that in the MAAs.[3]  The Operating Agreement

contains a non-disclosure provision and a non-competition provision.  (Tr. Ex. 242, ¶¶ 11.1,

11.2).  On the same day that the Operating Agreement was signed, Kadant and D'Amico in his

personal capacity and in his capacity as agent of D'Amico-controlled entities, including LSE and

UOG, executed the Non-Disclosure, Non-Solicitation & Non-Competition Agreement

("NDA").[4]  (Tr. Ex. 244).  The NDA contains its own non-disclosure and non-competition

provisions, as well as a non-solicitation provision.  (Tr. Ex. 244, ¶¶ 3.1, 4.1, 5.1).  In keeping

with the Court's May 8, 2010 Order, Michigan law applies when interpreting the NDA. (Rec.

Doc. 487 at 11).  That Order also held that the Buyout Agreement extinguished only the

Operating Agreement, and not the NDA, that the NDA was valid, that the non-disclosure

provision remained in force indefinitely, and that the non-competition and non-solicitation

provisions remained in force until January 16, 2012, that is, two years after the date of the

effective termination of the MAAs.  (Rec. Doc. 487 at 23).

     1. <u>Non-Disclosure Provision of the NDA</u>

     Kadant first alleges that Defendants violated the non-disclosure provision of the NDA,

which  states, in pertinent part:

---

    [3]As stated in an earlier portion of this Opinion, the Operating Agreement was terminated upon the parties' signing of the Buyout Agreement on December 20, 2006, wherein Kadant bought all of Defendants' interest in the Joint Venture.  (Tr. Exs. 52, 54, 55; Rec. Doc. 259-3, Ex. A-4).

    [4]The Court affirms its initial finding and its finding upon Defendants' Motion for Reconsideration that D'Amico was not an employee of the Joint Venture for the reasons stated in its May 8, 2012 Order, particularly because the Buyout Agreement, which contains an exclusive list of the Joint Venture's employees, does not include D'Amico.  (Rec. Doc. 487 at 11-12; Rec. Doc. 501; Tr. Ex. 250, ¶ 2.6; Tr. Ex. 250, Schedule 2.6).  Accordingly, the Court also declines to revisit whether Louisiana law applies to D'Amico as an employee of the Joint Venture.  The Court thus will not consider whether Louisiana law invalidates the NDA's restrictive covenants with respect to D'Amico in his individual capacity.

D'AMICO agrees on his own behalf and on behalf of all D'AMICO CONTROLLED ENTITIES to (a) *preserve the confidentiality* of the Confidential Information disclosed at any time to D'AMICO and not to disclose any Confidential Information to any third party . . . without the prior written consent of JOHNSON, (b) *use the Confidential Information only* for the purpose of furthering the interests of JOHNSON and the REGIONAL CENTER, and not to use the Confidential Information for any other purpose, and (c) *not to remove* at any time any physical or written material containing any Confidential Information, or any copies thereof, from JOHNSON's premises or from the premises of the REGIONAL CENTER, except for the purpose of JOHNSON's or the REGIONAL CENTER's business or with JOHNSON's written permission. . . .

(Tr. Ex. 244, ¶ 3.1) (emphasis added).  Unlike the MAAs, which do not define the term

"confidential," the NDA defines "Confidential Information" as follows:

Confidential Information means any and all proprietary and non-public information related to JOHNSON, or any other entity of The Johnson Corporation organization, and their business, and shall include, but not be limited to, JOHNSON's joint, syphon, and steam drying technology, the Johnson Diagnosys Inc. technology and the Cavallini technology (advanced controls), confidential proprietary inventions, know-how, production methods, processes, trade secrets, computer software, computer programs, including but not limited to [list of computer program names], computer printouts, proprietary integration of software systems and equipment, licenses, patent and patent applications, shop practices, product composition, products, equipment, manufacturing, financial, research, development, marketing and sales information, and related documentation and information, or any one or more of the foregoing.

(Tr. Ex. 244, ¶ 3.2).  The NDA also defines what was *not* "Confidential Information":

No information shall be Confidential Information which D'AMICO can show (a) was prior to the time of disclosure to D'AMICO or subsequently becomes (through no act or omission of D'AMICO) known to the general public through publication or otherwise, (b) was prior to the time of disclosure to D'AMICO in D'AMICO's possession without restriction on disclosure, and was not directly or indirectly derived from JOHNSON or any other entity of The Johnson Corporation, *or* (c) is received lawfully and independently by D'AMICO, without restriction on disclosure, and was not directly or indirectly derived from JOHNSON or any other entity of The Johnson Corporation. Confidential Information or its items or elements shall not be deemed to be known to the general public or in the possession of D'AMICO merely because it may be embraced in a more general disclosure or may constitute combinations of matters which individually (but not in such combinations) are at the time of disclosure to D'AMICO known to the general public or in the possession of D'AMICO.

(Tr. Ex. 244, ¶ 3.2) (emphasis added).

20

Kadant claims that Defendants violated the non-disclosure provision of the NDA by disclosing and/or improperly using the following items: actual hardware parts, part numbers, Kadant symbol numbers, part descriptions, assembly drawings, detail drawings, financial information, and corporate disclosure schedule information. The Court agrees with Defendants that parts, part numbers, symbol numbers, and part descriptions are not "Confidential Information" under the NDA and therefore that disclosure of these items, if any, does not constitute breach.

The non-disclosure provision of the NDA states that an item is not "Confidential Information" if it is known to the general public. (Tr. Ex. 244, ¶ 3.2(a)). Howe, Kadant's vice president of sales, conceded that the parts themselves were not confidential, and the Court agrees for the same reasons elicited by defense counsel: that the parts are "all over the place," and by Howe "They are sold, correct." (Tr. I at 168). Furthermore, it would make little sense to sell parts without disclosing the parts' numbers, descriptions, and symbol numbers, and Kadant presented no evidence that it kept that information from customers and potential customers. Kadant next contends that drawings possessed by Defendants (Tr. Ex. 113, 225) were confidential, but the Court finds that they were not "Confidential Information" as defined by the NDA because Kadant has failed to show that third parties did not have access to them. (Tr. V at 145-146) (third party Logan testifying that Kadant provides him with assembly drawings when it services one of his mills); (Tr. I at 167-168) (Howe testifying that Kadant provided installation instructions and assembly drawings to customers when they purchased a Kadant product). Additionally, for the same reasons as stated in subsection II.C.2., discussing the confidentiality provision of the MAAs, the Court finds that Defendants' Smurfit Stone and Rock-Tenn Demopolis presentations (Tr. Exs. 13, 878, 881) did not constitute disclosure of "Confidential

Information" because the presentations were open to the public and had been disclosed earlier in public forums by Kadant employees. (Tr. Exs. 228, 882, 912). Finally, Kadant claims that slides from Kadant's 2004 Boise Deridder dryer study are "Confidential Information," but the Court disagrees because Kadant did not refute that Defendants purchased the study or present evidence showing that Defendants were subject to actionable disclosure restrictions when they bought the study. Accordingly, all of these items meet one or more of the alternative criteria for falling outside of the definition of "Confidential Information" and their use or disclosure did not violate the non-disclosure provision of the NDA.

Defendants essentially concede that detail drawings, financial information, and the corporate disclosure schedule constitute "Confidential Information" under the NDA. (Rec. Doc. 675 at 15). However, the Court finds that Kadant failed to show that Defendants used or disclosed those items in violation of the non-disclosure provision of the NDA. As for the detail drawings, Wedel himself acknowledged that Kadant had no evidence that Defendants disclosed them or used them to compete with Kadant. (Tr. VIII at 130-131). Further, it is unclear what the purported detail drawings depict, as the exhibits are redacted. (Tr. Exs. 469, 472). Wedel also testified that Kadant had no evidence that Defendants used any of Kadant's financial information, including "pricing information from 2006, 2005, 2004, 2003." (Tr. VIII at 131-132). No evidence was provided to show that Defendants used Kadant's corporate disclosure schedule. Further, D'Amico testified that he did not remember seeing it. (Tr. II at 108-109). Finally, Kadant supplied no evidence demonstrating that Defendants had accessed, much less disclosed or used, confidential information available in Kadant's Lotus Notes and Visual Manufacturing programs. (Tr. II at 96-98; Tr. VIII at 131). Therefore, the Court finds that

Kadant has failed to prove that Defendants breached the non-disclosure provision of the NDA by a preponderance of the evidence.

      2. <u>Non-Competition and Non-Solicitation Provisions of the NDA</u>

      Kadant also claims that Defendants breached the non-competition and non-solicitation provisions of the NDA.  The non-competition provision of the NDA prohibits Defendants from engaging in the following:

> (a) Directly or indirectly enter into the employ of, or render any service to, or act in concert with, a Competitive Business;
> (b) Directly or indirectly engage in a Competitive Business on D'AMICO's own account or on account of any D'AMICO CONTROLLED ENTITY;
> (c) Request, encourage or cause any person, firm, [or other type of business entity] to withdraw, curtail or cancel a business relationship with JOHNSON or any of its subsidiaries or affiliated companies; or
> . . . .

> For purposes of this section, "Competitive Business" shall mean any person, firm [or other type of business entity] (other than JOHNSON or any other entity of The Johnson Corporation organization, including the REGIONAL CENTER) engaged in any business or in rendering any service anywhere in the world related to JOHNSON's joint, syphon, and steam drying technology, Johnson Diagnosys Inc. technology or the Cavallini technology (advanced controls).

(Tr. Ex. 244, ¶ 4.1).

      The non-solicitation provision states, in pertinent part:

> (a) . . . Neither D'AMICO nor any D'AMICO CONTROLLED ENTITY will knowingly solicit or encourage any employee of JOHNSON or any other entity of The Johnson Corporation organization including the REGIONAL CENTER to do any act that is disloyal to JOHNSON or the REGIONAL CENTER or materially adverse to the interests of JOHNSON, the REGIONAL CENTER, or in violation of any of the provisions of this Agreement.
> . . .
> (c) Neither D'AMICO nor any D'AMICO CONTROLLED ENTITY will (i) knowingly make any statement or do any act intended to cause any Existing Customer or Potential Customer of JOHNSON or the REGIONAL CENTER to purchase the products or make use of the services of any business in which D'AMICO or any D'AMICO CONTROLLED ENTITY . . ., and (ii) if sought out or contacted by an Existing Customer or Potential Customer will not provide products or render services to such

> Existing Customer or Potential Customer, if such products or services in any way relate to or arise out of JOHNSON's joint, syphon, and steam drying technology, Johnson Diagnosys Inc. technology or the Cavallini technology (advanced controls) or compete with [any of same list of items].
>
> . . . .
>
> For purposes of this section, the term "Existing Customer" shall mean a person who is a customer of JOHNSON or the REGIONAL CENTER . . . at the time of the termination of all agreements between JOHNSON or any other entity of The Johnson Corporation organization, including the REGIONAL CENTER, and D'AMICO or any D'AMICO CONTROLLED ENTITY.  The term "Potential Customer" shall mean a person or entity who was the target of sales or marketing activity either by JOHNSON or the REGIONAL CENTER during the twelve (12) month period immediately preceding the termination of all agreements between JOHNSON or any other entity of The Johnson Corporation organzantion, including the REGIONAL CENTER, and D'AMICO or any D'AMICO CONTROLLED ENTITY.

(Tr. Ex. 244, ¶ 5.1).

The Court finds that there is insufficient evidence that Defendants breached the non-competition and non-solicitation provisions of the NDA for two major reasons.  First, the Court finds that the parties did not intend for these provisions to apply to Defendants' sale of Kadant equipment or hardware.  Second, the Court finds that Kadant waived any right to assert breach of these provisions by making the 10% Agreement with Defendants following the effective termination of the MAAs.

### a. *Intent of the Parties*

The Court finds that the parties did not intend for the NDA to apply to hardware sales in the context of this case.  First, the text of the NDA indicates that those provisions would apply only if Defendants were given access to software technologies as part of the parties' new integrated relationship that was launched when they created the Joint Venture.  Second, testimony by Rudi Leerentveld, former president and CEO of Kadant, and James Dechnik, Kadant's former chief financial officer and chief operating officer, is evidence that Kadant itself

24

did not consider the NDA to apply to the sale of hardware goods.  Third, the NDA did not apply

to hardware sales when viewed in the context of the Operating Agreement and the MAAs.

The NDA contains three (3) provisions under the heading "Transfer of Technology,"

which state, in pertinent part:

> Johnson *will provide access* to JOHNSON's joint, syphon, and steam drying technology, such as computer software, computer programs, including but not limited to [list of computer program names], computer printouts, proprietary integration of software systems and equipment, research and development related thereto, and all related documentation and information, Johnson Diagnosys Inc. technology and the Cavallini technology (advanced controls) [(collectively, "the technology")] to the extent necessary for the REGIONAL CENTER to use such technology for its customers and to permit the REGIONAL CENTER to operate as a self-sufficient entity with limited support from JOHNSON. . . .

(Tr. Ex. 244, ¶ 2.1) (emphasis added).

> JOHNSON *may also provided [sic] access* to [the technology] to Louisiana Steam Equipment Co., Inc., a corporation solely owned by D'AMICO. . . .  Further, any employee of Louisiana Steam Equipment Co., Inc. who is approved by JOHNSON to have access to such technology must sign a Non-Disclosure Agreement as provided in Section 2.3 hereof, before JOHNSON will permit such employee to have access to its technology.

(Tr. Ex. 244, ¶ 2.2) (emphasis added).

> Before JOHNSON agrees to transfer any [the technology], D'AMICO agrees to have those employees who will have access to such technology sign Non-Disclosure Agreements . . . to protect JOHNSON's [technology] from wrongful disclosure and D'AMICO will provide signed copies to JOHNSON of each Non-Disclosure Agreement signed by an employee.

(Tr. Ex. 244, ¶ 2.3).

Defendants argue that Paragraphs 2.1 and 2.2 indicate that the transfer of the technology

was a condition precedent to their obligations under the non-competition and non-solicitation

provisions of the NDA.  In Michigan, a condition precedent "is an event, not certain to occur,

which must occur, unless its non-occurrence is excused, before performance under a contract

becomes due."  *Martin v. Transamerica Occidental Life Ins. Co.*, 2002 WL 1041337, *4 (E.D.

Mich. May 13, 2002).  Kadant argues that Paragraph 2.1 does not obligate it to provide

Defendants with any information at all, but the text is ambiguous on this point.  It states only that

"Johnson will provide access to [the technology] to the extent necessary for the REGIONAL

CENTER to use such technology . . . ."  (Tr. Ex. 244, ¶ 2.1).  It does not state to whom the

technology must be transferred.  It is clear, however, that Paragraph 2.1 is tied to the operation of

the Joint Venture, and it is arguable that the clause does not require Kadant to transfer the

technology to Defendants for purposes other than operating the Joint Venture.

Kadant also argues that while Paragraph 2.2 permits transfer of the technology to LSE,

that is not a condition precedent since it does not *require* such transfer.  (Tr. Ex. 244, ¶ 2.2)

("JOHNSON may also provided [sic] access to [the technology] to Louisiana Steam Equipment

Co., Inc.").  The Court is not persuaded, as Kadant presents no authority showing that such

permissive language cannot be a condition precedent.  Kadant further argues that "D'Amico

never explained why he would not have signed an agreement that contained a 'may' provision to

an aspect of the agreement with Plaintiff that he now claims was central to him."  (Rec. Doc. 676

at 6).  Kadant fails to explore the possibility that D'Amico was satisfied with this clause because

his obligations under the non-competition and non-solicitation agreement would be triggered

only if he received the technology.  The Court further notes that the NDA would probably be

invalid for lack of consideration were the transfer of the technology not a condition precedent.

Kadant argues that Defendants' obligation to abide by the non-solicitation and non-competition

provisions was in exchange for "extensive access to Plaintiff's confidential information."  (Rec.

Doc. 676 at 7).  As the Court found in subsection II.D.1., however, most of that information was

not confidential at all.  Kadant next argues that the purpose of the NDA was to create "greater

protection arising from the 'special relationship of trust'" referenced in the NDA.  However, for

the foregoing reasons, Kadant has failed to show by a preponderance of the evidence that the

defining characteristic of this new relationship, that is, access to the technology, ever came to

fruition.

No evidence was provided showing that D'Amico or any LSE or UOG employees signed

a Paragraph 2.3 non-disclosure agreement, demonstrating that no Johnson technology as defined

in the NDA was ever transferred.  Moreover, Leerentveld testified in his deposition that the

technology was not provided to Defendants.  (Rec. Doc. 642-1 at 39) (Q: "[T]he purpose of the

[NDA] that was entered into was in order to protect Johson Corporation in the event that you did

provide the technical programs to Mr. D'Amico, is that right?"  A: "Correct."  Q: "But you did

not provide the technical programs to Mr. D'Amico, correct?"  A: "Correct.").  In addition,

Dechnik, another Kadant executive, indicated that Kadant never intended to give Defendants

access to the "Cavallini technology and Johnson Diagnosis [sic] and all the systems software."

(Tr. VII at 164) (Q: "Your definition [of "access"] is is [sic] that none of these programs were

ever intended to be turned over to Mr. D'Amico for him to use independently of the Johnson

Corporation; is that right?"  A: "Correct.").

Finally, when viewed in the context of other agreements between the parties, the Court

finds that the non-competition and non-solicitation clauses of the NDA did not apply to hardware

sales.  The existence of a non-competition provision in the Operating Agreement, which

governed the Joint Venture, (Tr. Ex. 242, ¶ 11.2), demonstrates that the non-competition and

non-solicitation provisions in the NDA were intended as additional protection from disclosures

that went beyond the scope of the Joint Venture.  Furthermore, the existence of the MAAs,

which did not contain non-competition or non-solicitation provisions (Tr. Exs. 240, 241; Tr. II at

10-11), and the parties decision to create a new agreement with non-competition and non-

solicitation provisions rather than amend the MAAs to include them, also suggests that those provisions did not apply to MAA activities, that is, sale and purchase of hardware.  The sale and purchase of hardware were activities that had characterized the parties' relationship for decades and Kadant showed no evidence that those activities were ever restricted by non-competition or non-solicitation provisions.  As stated above, the Court has found that Defendants did not receive the key information that would have modified the parties' longstanding relationship with respect to the sale and purchase of hardware.  For the foregoing reasons, the Court finds by a preponderance of the evidence that Defendants did not breach the non-competition and non-solicitation provisions of the NDA, and those claims are dismissed.

> b. *Waiver*

In addition to finding that the parties did not intend the NDA to apply to hardware sales under the circumstances of this case, the Court independently finds that Kadant waived its right to assert breach of contract claims under the non-competition and non-solicitation provisions of the NDA by executing the post-MAAs 10% Agreement with Defendants all while having actual notice that D'Amico intended to sell Kadant parts under a "brand neutral" approach.  A party waives a right when it voluntarily and intentionally abandons that right.  *See Quality Products and Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003).  Waiver is established if there is clear and convincing evidence of a written or oral agreement or affirmative conduct showing that the parties "mutually agreed to modify or waive their contract."  *Quality Products*, 666 N.W.2d at 254 (stating that "[m]ere knowing silence generally cannot constitute waiver"); *see also Kloian v. Domino's Pizza, L.L.C.*, 733 N.W.2d 766, 771 (Mich. App. 2006) ("'This mutuality requirement is satisfied where a waiver or modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct

establishing mutual agreement to modify or waive the particular original contract.'") (quoting *Quality Products*, 666 N.W.2d at 253-254).

The Court finds that Kadant was aware of D'Amico's brand neutral approach as early as November 22, 2009. On November 22, 2009, days after receiving Kadant's notice of termination of the MAAs, Howe emailed Wedel, informing him that "Going forward, [D'Amico] will proceed with [his process and utility optimization approach to the market] on a 'brand neutral' approach to hardware." (Tr. Ex. 95). D'Amico had informed Howe and Eklund of his brand neutral approach during a call on November 20, 2009. (Vol. I at 244; Tr. Ex. 94). D'Amico did not hide that this was his approach, stating again, in an April 16, 2010 conversation with Howe and Eklund that D'Amico did not know was being recorded, that some of the Kadant products were "interchangeable" with other products he was selling, and implying that he was not selling parts according to their brand. (Ex. A, 4"20-4"45) ("I can't sit here and tell you, in other words, on some of the components that are applied to like Georgia-Pacific Monticello, let's say Boise Jackson, Boise Deridder, a lot, some of that stuff [let's use] PTX as an example, some of that stuff is interchangeable.").

As explained in subsection II.C.3., days after the effective termination of the MAAs, the parties entered into an agreement wherein Kadant would sell parts to Defendants at a 10% discount. (Tr. Exs. 102, 258). While some of the terms of this agreement are disputed, there is no dispute that Kadant would sell parts at a 10% discount to Defendants, who would then resell those parts to various mills. (Tr. Exs. 102, 258). As Howe explained, such an arrangement "will encourage [customers to] use our parts vs. other supply." (Tr. Ex. 102). The agreement fully contemplates that Kadant and Defendants may compete for customers, since it states that Defendants would get the 10% discount for products they resell to customers, but that "[p]art

29

orders placed directly from customers to Kadant Johnson do not qualify for discount or commission payment to [Defendants]."  (Tr. Ex. 258).  In addition, Howe stated that "this applies to only orders LSE places with us in their previous territory's mills.  If a customer places an order with us directly, LSE will not receive a discount or commission."  (Tr. Ex. 102).  Thus, the parties contemplated that customers seeking the same Kadant parts might either buy them indirectly from Defendants, or directly from Kadant.  Kadant presented no evidence showing that Kadant intended Defendants to stop using their brand neutral approach as a term or condition of the 10% Agreement.

Kadant states that to find that Kadant waived its right to bring breach of contract claims under the NDA, the Court would have to "completely disregard the principle that one who seeks equity must do equity."  (Rec. Doc. 674 at 19).  To the extent that this criticism applies to a waiver defense, the Court dismisses it because Kadant gives no specific reason why Defendants' hands are unclean, and the Court finds none.  Moreover, the Court finds that Kadant executed the 10% Agreement while knowing that Defendants intended to sell Kadant parts under a brand neutral approach to customers whom Kadant was aware could also have been their customers. Further, Kadant failed to mention the NDA at all in the November 13, 2009 notice of termination of the MAAs (Tr. Ex. 4), further indicating, albeit through silence, that Kadant did not believe that the NDA applied to hardware sales like those for which it alleges breach of contract here. Therefore, the Court finds by clear and convincing evidence that these affirmative acts constitute waiver of the non-solicitation and non-competition provisions of the NDA.  Accordingly, Defendants' brand neutral sales of Kadant and non-Kadant parts did not violate the NDA, and the NDA breach of contract claims are dismissed for this reason as well.

### E. Defendants' Counterclaims

Defendants assert counterclaims against Kadant for defamation, tortious interference, unfair trade practices, and breach of the "non-disparagement" clause of the December 20, 2006 Buyout Agreement through which Kadant bought all of Defendants' interest in the Joint Venture. As a basis for these claims, Defendants allege that Kadant falsely represented to LSE's customers on several occasions that LSE was selling non-Kadant parts under the pretense that they were Kadant parts. They maintain that these attacks were part of a "multi-state smear campaign," occurring in eight (8) states (Louisiana, Mississippi, Alabama, Georgia, Florida, Tennessee, Oregon, and Washington), to hurt Defendants' business. (Rec. Doc. 663 at 1-2). The Court addresses each of the four types of claims in turn.

### 1. Defamation

To establish a defamation claim under Louisiana law, the claimant must prove "'(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury.'" *Costello v. Hardy*, 864 So. 2d 129, 139 (La. 2004) (quoting *Trentecosta v. Beck*, 703 So. 2d 552, 559 (La. 1997). These elements are in the Second Restatement of Torts and are similar to those in the other seven (7) relevant jurisdictions.[5] Rest. 2d Torts § 558 (1977).

Given that the elements of a defamation claim are nearly identical in all of the pertinent jurisdictions, the Court looks to the Second Restatement of Torts for clarification rather than

---

[5]*See Speed v. Scott*, 787 So. 2d 626, 631 (Miss. 2001); *Gary v. Crouch*, 867 So. 2d 310, 315 (Ala. 2003); *Eason v. Marine Terminals, Inc.*, 710 S.E.2d 867, 871 (Ga. Ct. App. 2002); *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008); *Sullivan v. Baptist Mem. Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999); *Muresan v. Philadelphia Romanian Pentecostal Church*, 962 P.2d 711, 716 (Or. App. 1998); *Alpine Indus. Computers, Inc. v. Cowles Pub. Co.*, 57 P.3d 1178, 1183 (Wash. App. Div. 3 2002).

draw on case law from all eight (8) jurisdictions (an endeavor which the parties themselves did not undertake). A statement is "defamatory" "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Rest. 2d Torts § 559. A defamatory statement is a "publication" when it is communicated "intentionally or by a negligent act to one other than the person defamed"; in other words, the statement is published when it is communicated to a third party. Res. 2d Torts § 577. The "fault" element is met if the alleged defamer "(a) knows that the statement is false and that it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them." Rest. 2d Torts § 580B. Finally, examples of "privileged" communications that do not qualify as "defamatory" include the following: statements by a party to a private litigation concerning another that relate to the judicial proceeding and that are preliminary to, made in the institution of, or made during the course of that judicial proceeding (Rest. 2d Torts § 587) (absolutely privileged); (2) "if the circumstances induce a correct or reasonable belief that (a) there is information that affects a sufficiently important interest of the publisher, and (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest"; (Rest. 2d Torts § 594) (conditionally privileged); and (3) "if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know." Rest. 2d Torts § 596 (conditionally privileged); *see also Gunder's Auto Center v. State Farm*, 422 Fed. Appx. 819, 820, 821 (11th Cir. 2011) (holding that the common interest privilege applied where defendant insurer told its insureds that plaintiff "overcharged customers; and that [plaintiff's] repairs were untimely, inefficient and sub-

standard" because those communications were of "mutual interest" to insurer and insureds) (applying Florida law).

Some of the pertinent jurisdictions provide that the claimant need not prove economic damage if it proves that a published defamatory statement harmed its professional reputation. *See Costello*, 864 So. 2d 129, 140 ("Words . . . which by their very nature tend to injure one's personal or professional reputation, even without considering extrinsic facts or surrounding circumstances are considered defamatory *per se*."); *Speed v. Scott*, 787 So. 2d 626, 632 (Miss. 2001) (stating that "no special harm need be shown" when the defamatory words are "[w]ords imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of a profession, trade or business.") (quoting *W.T. Farley, Inc. v. Bufkin*, 132 So. 86, 87 (Miss. 1931)); *Diplomat Elec., Inc. v. Westinghouse Elec. Supply Co.*, 378 F.2d 377, 382 (5th. Cir. 1967) ("words which tend to charge that one is unscrupulous, dishonest and unworthy of confidence, or is improperly exercising his lawful business trade, profession or office are actionable *per se*) (citations omitted) (applying Florida law); *Muresan v. Philadelphia Romanian Pentecostal Church*, 962 P.2d 711, 716 (Or. App. 1998) ("if [the statement] . . . derogated the plaintiff's business, trade or profession . . . the plaintiff is not required to establish that the publication of the statement caused economic damage.") (citing *Hinkle v. Alexander*, 417 P.2d 586, 587 (1966).  The Court applies these legal principles to the alleged defamatory statements as follows.

### g. *October 19, 2007 Email (Tr. Ex. 166)*

This email from Wedel to Howe and Eklund indicates that one "item for consideration" would be to "[p]rivately call Frank Brown [an executive at International Paper] to give him a heads up that [D'Amico and another individual] are building a story that Frank rigged the

Riegelwood installation bids so that [Mr. Brown's wife, Tami, at Steam Systems] would get the contract." (Tr. Ex. 166). Defendants provided no evidence that this email was sent to third parties. Intra-corporate communications are not "publications" to a third party. *See, e.g., Hines v. Ark. La. Gas Co.*, 613 So. 2d 646, 656 (La. App. 2d Cir.), *writ denied*, 617 So.2d 932 (1993). The Court finds that the October 19, 2007 email was not published to a third party. Further, Defendants provided no evidence that Wedel or any other Kadant employee followed through with this "item for consideration." Accordingly, the Court declines to consider whether the email satisfied the other elements of defamation and finds that statements in the email are not actionable.

### b. *March 10, 2010 Email (Tr. Ex. 172)*

This email by Wedel begins with the heading "Items for consideration" and includes ideas for ways in which Kadant might choose to distance itself from Defendants following the termination of the MAAs. (Tr. Ex. 172). It concludes with the question "Can you think of any more bombs for us to throw [D'Amico's] way? This email was sent to Howe and Eklund, both Kadant employees. Defendants provided no evidence that this email was sent to third parties or argue that it was sent to a third party. Accordingly, the statement cannot be the basis for a defamation claim for the reasons stated in subsection II.E.1.a.

### c. *March 24, 2010 Telephone Call (Tr. Ex. 175)*

Defendants claim that the notes in this exhibit were taken during a telephone call between Wedel, Howe, and Eklund. They do not claim that any information in the telephone call or the notes was published to a third party. Therefore, for the reasons stated in subsection II.E.1.a., the Court finds that no statements during the phone call or in the notes were "published." Accordingly, they are not actionable.

34

d. *Kadant Sales Force Meetings*

Relying on Kadant sales manager Monteith's testimony, Defendants allege that Kadant employees used the terms "counterfeit" and "pirate parts" during meetings with Eklund and other members of the sales force beginning at some point in 2010.  (Tr. IV at 225).  Defendants point to no evidence showing that these statements were published to third parties.  Accordingly, for the reasons stated in subsection II.E.1.a., the Court finds that statements cannot be the basis of a defamation claim.

e. *Instructions by Kadant to Its Employees Re: "Pirate Parts" (Tr. Exs. 103, 112)*

Defendants maintain that instructions to Kadant employees to warn customers that some of the parts they bought thinking they were Kadant parts may in fact have been "pirated products" manufactured by other companies were "external communications to LSE customers or potential customers.  (Rec. Doc. 663 at 20, referring to Tr. Exs. 103, 112).  One of these documents is marked with the phrase "Draft - 3/26/2010," and contains blank fields for the addressee's name and address.  (Tr. Ex. 103).  The other also contains blank fields for the addressee's name and address.  (Tr. Ex. 112).  Besides the fact that neither of these documents refer to Defendants by name, and appear to be drafts of a letter Kadant appears to have intended to send to customers, the Court does not find that either of these documents were actually sent to third parties.  Therefore, the Court finds that they do not constitute actionable statements  for the reasons stated in subsection II.E.1.a.

f. *Other Statements Which Defendants Concede Were "Internal Communications"*

Similarly, the Court finds that statements with respect to which Defendants explicitly concede were "internal" were not published to a third party and are therefore not actionable  for

35

the reasons stated in subsection II.E.1.a.  (Rec. Doc. 663 at 20, referring to Tr. Exs. 104 (April 5-

6, 2010 emails from Wedel to How, Eklund, and Martz); 362 (May 12, 2010 email from Howe to

Wedel and from Eklund to Howe and Jim Patterson, another Kadant employee); 261 (May 19,

2010 letter from Defendants' counsel Thomas Hubert to what appears to be counsel for Kadant,

Patrick Hickey); 573 (January 20, 2011 email from Pierce to Monteith, Eklund, Howe, Wedel,

and Pat Boucher, another Kadant representative); 187 (January 26, 2011 Graphic Packaging

Customer Visit Report by Pierce and Monteith)).

g. *Script for Phone Calls to LSE Customers (Tr. Ex. 19)*

As discussed in Section C. of this Opinion, Kadant notified Defendants that it was

terminating the MAAs on November 13, 2009, but the effective date of termination was January

16, 2010.  (Tr. Ex. 4).  Defendants claim that despite this understanding, Kadant told LSE

customers that Defendants would no longer be a Kadant authorized representative prior to the

effective termination of the MAAs.  They indicate that a November 16, 2009 email from Howe

to several Kadant employees directed the employees to make "[p]ersonal phone calls to all know

[sic] LSE customers advising them of the change."  (Tr. Ex. 89).  The email further directed

them to "[f]ollow-up [sic] in 30 days (WJH - script has been prepared)."  (Tr. Ex. 89).

Defendants then point to a script that states that "[LSE is] no longer a Kadant Johnson authorized

representative.  You should place all of your orders directly with the Kadant Johnson factory."

(Tr. Ex. 19).  The script, however, does not contain a name or date or any indication of which

customers were contacted using this script, if any, and if any, whether all portions of the script

were used in the phone call.  Defendants provide no evidence to answer these questions.

Accordingly, the Court finds that the preponderance of the evidence does not show that the script

was published to a third person.

36

Even assuming Defendants had met the publication element, their defamation claim based on Kadant's statement that Defendants were no longer representatives of Kadant would fail.  The MAA focusing on paper products contains a clause that makes termination effective sixty (60) days after notification of termination (Tr. Ex. 241 at ¶ 5.01), while the MAA focusing on industrial markets products' analog makes termination effective thirty (30) days after notification of termination.  (Tr. Ex. 240 at ¶ 5.01).  Regardless of the language in the latter MAA, the notice of termination by Kadant to Defendants indicated that termination would be effective on January 16, 2010, or sixty (60) days following the notice.  (Tr. Ex. 4).  While the Court has found that the effective termination of the MAAs was January 16, 2010, and thus, that the statement that Defendants were no longer Kadant's representative is false, the Court is not convinced that this statement qualifies as "defamatory."  As stated earlier, courts generally consider that a statement is "defamatory" "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."  Rest. 2d Torts § 559.  Defendants have not shown that this statement was of the type to so harm reputation.  Finally, even if they had, they failed to show any evidence that the statement caused them any damage.  Defendants' claim based on statements by Kadant to Defendants' customers, if any, that Defendants were no longer representatives of Kadant prior to the effective termination of the MAAs, therefore fails.

h. *April 5, 2010 Email (Tr. 155)*

In this email, Wedel directs Kadant employees Howe, Eklund, and Wes Martz to send a letter to customers alerting them that companies affiliated with Kadant may have been selling "pirate products."  (Tr. Ex. 155).  The letter does not name any of the Defendants, but the email itself mentions D'Amico and LSE and implies that they are the object of the letter.  The email

37

also directs Kadant employees to "verbally reinforce" that "[p]irate parts do <u>not</u> meet the requirements of the ASME Pressure Vessel Code, Canadian Design Registration, and European Pressure Equipment Directive."  (Tr. Ex. 155) (emphasis in original).  However, to the extent that Defendants claim that this email is defamatory, the Court finds that it is not.

Defendants point only to one instance where the letter was published to a third party: Georgia-Pacific Monticello.  Eklund, Kadant's regional sales director for the South and Southeast part of the Paperline group, testified that he gave to a Georgia-Pacific Monticello representative a copy of the "pirated parts" letter attached to the April 5, 2010 email from Wedel to several Kadant employees.  (Rec. Doc. 155).  The Court finds that the letter does not contain defamatory words because it does not reference any of the Defendants by name, and none of the language in the letter could be construed by a Kadant outsider as directed toward Defendants.  Therefore, the Court finds that the publishing the letter to Georgia-Pacific Monticello or to other parties, if any, is not actionable.

i. *Kadant's April 20, 2010 Statement About Parts to Kimberly-Clark Alabama*

Sue-Anne Pierce testified that she told Mark Socha, a representative of the Kimberly-Clark mill in Alabama, that Defendants "may be pirating parts."  (Tr. III at 203).  The Court finds that Pierce made this statement, but it does not find this statement satisfies the definition of "defamatory."  In *Heft v. Burk*, a case decided by the Louisiana Fourth Circuit Court of Appeal, the Court held that the word "pirate" was not defamatory in the context of that case.  302 So. 2d 59 (La. App. 4 Cir. 1974).  There, the plaintiff, an engineer, claimed that the defendant, a competitive engineering firm, defamed him by stating in a letter than he had attempted to "proselyte employees" of the firm and "pirate personnel from [the firm]."  *Heft*, 302 So. 2d at 59, note 1.  The court held that the firm's letter "does not charge wrongdoing[]" and "is merely an

opinion of the writer that one engaging in the practice of hiring personnel from a place of employment is unethical conduct." *Heft*, 302 So. 2d at 60. The court added that "[t]he words 'proselyte and 'pirate' might be considered strong words to describe this practice, but their use does not make the statement defamatory." *Heft*, 302 So. 2d at 60.

The analysis in *Heft* applies here as well. Defendants have failed to convince the Court that the phrases "pirated" or "counterfeit" or "knock-off" used by Kadant to describe Defendants' parts following the rupture of their relationship rises to the level of defamatory words. Like in *Heft*, the words were used by one company to describe the products of another company engaged in the same business. The Court further notes that the *Heft* decision was made despite the existence in Louisiana of a cause of action for *per se* defamation when defamatory statements are made about a person's professional reputation. In addition, other courts agree that the term "pirate" is not actionable. *See, e.g., Farmer v. Hersh*, 2007 WL 2264435, *6 (Tenn. Ct. App. 2007); *Arista Records, Inc. v. Flea World, Inc.*, 356 F. Supp. 2d 411, 425-426 (D.N.J. 2005). Finally, Defendants presented no authority showing that such words *were* defamatory, let alone defamatory *per se*.

Even assuming the Court had found the above words to be defamatory, it would not find that Kadant used those terms negligently, recklessly, or maliciously. Defendants themselves acknowledge, and the Court has found, that as of November 22, 2009, Kadant was aware, through Wedel's communication with D'Amico, that Defendants would employ a "brand neutral" approach to hardware sales "[g]oing forward." (Tr. Ex. 95). A reasonable person could interpret the brand neutral" approach to mean that non-Kadant parts and Kadant parts would be sold together, without distinction, and thus that a non-Kadant part could be sold without the buyer specifically knowing that the part was in fact a Kadant part, and vice-versa. Finally,

Defendants have not shown any satisfactory evidence that use of these terms by Kadant caused Defendants harm to their reputation or loss of business or other economic damages.

j. *July 26, 2010 Email to Georgia-Pacific Camas (Tr. Ex. 587)*

To the extent that Defendants base a defamation claim on this email, the Court is unpersuaded. This email was sent by Kadant employee Tyson Marquardt to Brian Card, who at the time was the manager of day-to-day operations of the No. 20 paper machine at Georgia-Pacific Camas. (Tr. Ex. 587). The Court therefore agrees with Defendants that the email was "external" (Rec. Doc. 663 at 20) in that it was sent to a third party. Marquardt explains that the parts Camas was ordering from E.S. Constant were not Kadant parts, but rather that "you're getting pirate parts that were made from obsolete inventory from Louisiana Steam Equipment/UOG . . . ." (Tr. Ex. 587). Eklund to Michael Edwards, a Georgia-Pacific Monticello representative. (Tr. Ex. 226). For the reasons explained in subsection II.E.1.i, the Court does not find that this email contains defamatory words. Therefore, Defendants' claim with respect to this email is dismissed.

k. *Ongoing lawsuit*

Defendants claim that Eklund's August 13, 2010 email directing Shawn Clement, a Kadant employee, to inform Duane Riley, a representative of the Georgia-Pacific Brewton, Alabama mill of the ongoing lawsuit between Kadant and Defendants constitutes defamation. (Tr. Ex. 361). The statement Clement was deliver was: "There is an on-going lawsuit between KJ and LSE. The suit involves LSE competing against KJ selling pirated, non-KJ original parts." (Tr. Ex. 361). This claim fails for three reasons. First, there is no indication that Clement actually said this information to third party Duane Riley or that Riley saw the email. Second, the statement was true, since Plaintiffs sued Defendants for the instant claims in

40

Alabama state court on June 21, 2010.  (Rec. Doc. 1-8).  Third, the statement is privileged, since it was by a party to the litigation, related to an ongoing judicial proceeding, and was made during the course of that judicial proceeding.  *See* Rest. 2d Torts § 587.  Defendants have failed to show evidence rebutting any of these reasons.  Therefore, their claim based on this statement is not actionable.                    l. *October 30, 2010 Email to Georgia-Pacific Monticello (Tr. Ex. 226)*

To the extent that Defendants base a defamation claim on this email, the Court disagrees. This email was sent by Eklund to Michael Edwards, a Georgia-Pacific Monticello representative. (Tr. Ex. 226).  The Court therefore agrees with Defendants that the email was "external" (Rec. Doc. 663 at 20) in that it was sent to a third party.  The letter associates LSE with "pirate parts" in that it states that Kadant sold parts to LSE through May or June 2010, and that, as a result, Kadant "cannot ensure parts provided to GP Monticello" are "genuine Kadant parts" or "pirate copy parts" which had experienced "product failures."  (Tr. Ex. 226).  For the reasons explained in subsection II.E.1.i,  the Court does not find that this email contains defamatory words. Therefore, Defendants' claim with respect to this email is dismissed.

m. *Seal Ring Study at Graphic Packaging International ("Graphic Packaging")*

Defendants claim that Kadant's April 20, 2011 Product Evaluation Report on seal rings prepared by Gerald Timm was used to deceive Graphic Packaging into ending its business relationship with Defendants.  (Tr. Ex. 584).  The Court is unpersuaded.  Defendants presented no evidence suggesting that the study was deceptive.  None of the testimony by Timm indicated that the study was deceptive.  No testimony by Paul Cornelison, a reliability engineer for Graphic Packaging, demonstrated that he believed the study to be deceptive.  In fact, Cornelison stated that he was dissatisfied with Defendants' seal rings, suggesting that there was some merit to the study.  (Tr. VI at 27).  It is irrelevant that Defendants conducted their own study and found

41

conflicting results.  Based on the foregoing facts, the Court cannot find, by a preponderance of

the evidence, that the study was defamatory or that Defendants were negligent in sharing it with

third parties.  Accordingly, any defamation claim on this ground is not actionable.

### n. *January 2011 Statement to Graphic Packaging*

Any claim that Kadant told Cornelison that Defendants were selling "pirated" or

"counterfeit" products is dismissed for two reasons.  First, it is dismissed for the reasons

explained in subsection II.E.1.i.  Second, there is insufficient evidence for the Court to find, by a

preponderance of the evidence, that Kadant made any such statement to Cornelison.  Cornelison

testified at trial that Pierce, Eklund, and Monteith visited Graphic Packaging on January 26,

2011, but that he "can't say either way" whether Eklund or any of them using the word

"pirating" or "counterfeit" being used to describe Defendants or their parts.  (Tr. VI at 32-33).

### o. *June 3, 2011 Letter to Mills (Tr. Ex. 319)*

This letter by Wedel is not defamatory for the same reasons as the first "pirated parts"

letter which Wedel directed Kadant employees to send to mills in his April 5, 2010 email

discussed in subsection II.E.1.i.  The letter contains no reference to Defendants and the Court

does not find that it could be construed by a non-Kadant employee as specifically directed at

Defendants.

### p. *June 3, 2011 Email to Superior Fabricators (Tr. Ex. 220)*

This is an email by Pierce to Don Lasseigne, Superior Fabricators' purchasing, safety,

environmental, and office manager.  The Court agrees with Defendants that it is a third party

communication (Rec. Doc. 663 at 20), but it contains no defamatory words.  It implies only that

Defendants were selling "pirate parts" and that customers were not necessarily receiving Kadant

parts when they thought they were.  (Tr. Ex. 200).  Therefore, any claim that this email is

defamatory is dismissed for the reasons explained in subsection II.E.1.i.

q. <i>June 22, 2011 Email to Georgia-Pacific Toledo (Tr. Ex. 585)</i>

For the reasons explained in subsections II.E.1.i. and II.E.1.j., the Court does not find

that this email contains defamatory words.  It is from Kadant employee Jerome Korey to

Georgia-Pacific Toledo representative Michael Tinsley.   (Tr. Ex. 585).  The Court therefore

agrees with Defendants that the email was "external" (Rec. Doc. 663 at 20) in that it was sent to

a third party.  The email associates Defendants with the sale of "pirated parts" by stating that

"Kadant Johnson is in the middle of a lawsuit with Louisiana Steam where ES Constant

purchases their parts" and "Customers have provided the pirated parts to us for testing which we

ran on the dryers with extremely poor results."  (Tr. Ex. 585).  First, the Court has found that the

term "pirate" in this context is not defamatory.  Second, the statement is privileged because it is

by a party to ongoing litigation, which had begun on June 21, 2010, and it relates to the

litigation.  Therefore, any defamation claim based on this email is dismissed.

r. <i>June 27, 2011 Email to Georgia-Pacific Toledo (Tr. Ex. 221)</i>

The Court does not find that content of this email is defamatory for the reasons stated in

subsections II.E.1.i. and II.E.1.j.  The email, again from Korey to Tinsley, also refers to Kadant's

lawsuit against Defendants for sale of "pirated parts."  (Tr. Ex. 221).  These statements are not

defamatory and they are privileged.

### 2. Tortious Interference

Defendants allege that Plaintiffs tortiously interfered with Defendants' existing and

prospective customers in seven (7) states (Mississippi, Alabama, Georgia, Florida, Tennessee,

Oregon, and Washington).  The elements for intentional interference with economic relations are

essentially identical in all jurisdictions, with some jurisdictions containing two separate torts for

interference with a "business relation" on one hand and with a "contractual obligation" on the

other.[6]  Taking the Oregon cause of action as an example, the Defendants must prove the

following: "(1) the existence of a professional or business relationship (which could include,

e.g., a contract or a prospective economic advantage), (2) intentional interference with that

relationship, (3) by a third party, (4) accomplished through improper means or for an improper

purpose, (5) a causal effect between the interference and damage to the economic relationship,

and (6) damages."  *McGanty v. Staudenraus*, 901 P.2d 841, 844 (Or. 1995).  *See also Leingang*

*v. Pierce County Medical Bureau, Inc.*, 930 P.2d 288, 300 (Wash. 1997); *Century 21 Academy*

*Realty, Inc. v. Breland*, 571 So. 2d 296, 297-298 (Ala. 1990).

    All of the relevant jurisdictions require a causal link between the alleged improper

conduct that harmed the business relationship between the claimant and a third party, as well as

damages to the claimant.  Because Defendants have proven neither element by a preponderance

of the evidence with respect to their business relations with customers, the Court dismisses all of

their tortious interference claims.  Defendants specifically point to loss of business in only two of

its customer relationships: Georgia-Pacific Monticello and Graphic Packaging.  Defendants

failed to analyze the evidence under each element of a tortious interference claim.  They fail to

---

[6]*See, e.g.*, Mississippi: *Par Indus., Inc. v. Target Container Co.*, 708 So. 2d 44, 48 (Miss.
1998); Georgia: *Carroll Anesthesia Assocs., P.C. v. Anesthecare, Inc.*, 507 S.E.2d 829, 832 (Ga.
Ct. App. 1998); *Tom's Amusement Co., Inc. v. Total Vending Servs.*, 533 S.E.2d 413, 416 (Ga.
Ct. App. 2000); Florida, *McLinney-Green, Inc. v. Davis*, 606 So.2d 393, 397-398 (Fla. Dist. 1 Ct.
App. 1992); *Magre v. Charles*, 729 So. 2d 440, 443-444 (Fla. Dist. 5 App. Ct. 1999); and
Tennessee: *Jones v. LeMoyne-Owen College*, 308 S.W.3d 894, 908 (Tenn. Ct. App. 2008); *New
Life Corp. v. Thomas Nelson, Inc.*, 932 S.W. 921, 927 (Tenn. App. Ct. 1999)).

show that any acts or statements by Defendants were the reason that these two customers chose to stop doing business with Defendants.  Furthermore, as explained above, they failed to present evidence that any statements by Kadant harmed their reputation in the eyes of Defendants' customers.

Furthermore, Defendants concede that the facts upon which they are basing their defamation claims are the same as those on which they are basing their tortious interference claims (and their unfair trade practices claims).  (Rec. Doc. 669-2 at 5).  The Ninth Circuit has held has held that when a claimant makes tortious interference claims based on the same facts as their defamation claims, if the defamation claim fails, then so does the tortious interference claims.  *I.C. Marketing, Inc. v. Amos Press, Inc.*, 147 Fed. Appx. 671, 673 (9th Cir. 2005) (so holding on the ground that the claim of "wrongfulness" essential to the interference claim rested on the defamation claim, so that when the defamation claim was failed, so did the interference claim).  The Court is also persuaded by this reasoning, and therefore dismisses Defendants' tortious interference claims also for this reason.

### 3. Unfair Trade Practices

Defendants allege that Kadant violated the unfair trade practices laws of eight (8) states (Louisiana, Mississippi, Alabama, Georgia, Florida, Tennessee, Oregon, and Washington).  The Louisiana Unfair Trade Practices Law ("LUPTA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  La. Rev. Stat. § 51:1405 (A).  Louisiana requires claimants to prove that the defendants engaged in some "fraud, misrepresentation, deception, or unethical conduct."  *Dufrau v. Creole Engineering, Inc.*, 465 So. 2d 752, 758 (La. App. 5 Cir.), *writ denied*, 468 So. 2d 1207 (La. 1985).  *See also Turner v. Purina Mills, Inc.*, 989

F.2d 1419, 1422 (5th Cir. 1993) (explaining that, under LUPTA, "[b]usinesses are still free to pursue profit, even at the expense of competitors, so long as the means used are not egregious," and "the statute does not provide an alternate remedy for simple breaches of contract.").  The other relevant jurisdictions have similar statutes prohibiting unfair trade practices. *See* Miss. Code Ann. § 75-24-5(2)(h); Code of Ala. § 8-19-5(8); O.C.G.A. § 10-1-372(a)(8); Fla. Stat. § 501.204; Tenn. Code Ann. § 47-18-104(b)(8); Or. Rev. Stat. §§ 646.607(1)-608(1)(h); Rev. Code Wash. § 19.86.020.

Again, Defendants concede that the facts upon which they are basing their defamation claims are the same as those on which they are basing their unfair trade practices claims, and the Court finds that the reasoning in *I.C. Marketing* applies to Defendants' unfair trade practices claims as well.  Defendants provide no authority to rebut this contention, stating only that for the Louisiana trade practices claim, "Kadant need only prove that Kadant engaged in unfair or deceptive practices and those practices caused harm to Defendants."  (Rec. Doc. 669-2 at 5). This argument fails with respect to their LUPTA claim, Defendants must also prove that Kadant engaged in fraud or misrepresentation or deception" *Dufrau*, 465 So. 2d at 758, and the conduct was "egregious." *Turner*, 989 F.2d at 1422.  It also fails because it is incomplete, as it does not address their claims under the seven (7) other states' laws under which they claim unfair trade practices.  Rather than analyze the various elements of these laws under the facts in this case, Defendants state that they have provided "substantial evidence" of Kadant's unfair practices. The Court is unpersuaded and dismisses all of Defendants' unfair trade practices claims.

4. Non-Disparagement Clause of the Buyout Agreement

The December 20, 2006 Buyout Agreement, through which Kadant bought all of Defendants' interest in the Joint Venture, contains a "non-disparagement" clause that states:

> Each party agrees that at no time following the Closing Date shall it make any disparaging statements concerning any other party hereto or such party's business, officers, directors, employees, agents or affiliates.

(Tr. Exs. 52, 54, 55; Rec. Doc. 259-3, Ex. A-4, ¶ 4.4).  The term "disparaging" is subject to many interpretations and degrees of severity, none of which were sufficiently explored by Defendants in exhibits or in testimony at trial.  Furthermore, they devoted but one (1) line to this claim in their post-trial briefs.  (Rec. Doc. 663 at 20).  Accordingly, the Court finds there is insufficient evidence for it to find, by a preponderance of the evidence, that any of Kadant's statements satisfy the definition and constitute a breach of the Buyout Agreement, and this claim is also dismissed.


## III. CONCLUSION

Both this case, and the companion patent case (Case No. 11-36) have expended enormous resources on attorney representation.  Both sides have exhaustively briefed all issues, having had full opportunity to do so.  In light of that, the Court will look negatively at any motion for reconsideration unless it is narrowly focused on perceived clear error, succinctly and briefly stated, and does not rehash arguments already made.  It is time for this case to be over.

Accordingly,

IT IS ORDERED that Kadant's claims for breach of the two May 14, 1993 Manufacturer's Agent Agreements are DISMISSED.

IT IS FURTHER ORDERED that Kadant's claims for breach of the January 20, 2010 10% Agreement are DISMISSED.

IT IS FURTHER ORDERED that Kadant's claims for breach of the August 6, 1999 Non-Disclosure, Non-Competition & Non-Solicitation Agreement are DISMISSED.

47

IT IS FURTHER ORDERED that Defendants' counterclaims for defamation are DISMISSED.

IT IS FURTHER ORDERED that Defendants' counterclaims for tortious interference are DISMISSED.

IT IS FURTHER ORDERED that Defendants' counterclaims for unfair trade practices are DISMISSED.

IT IS FURTHER ORDERED that Defendants' counterclaims for breach of the December 20, 2006 Buyout Agreement are DISMISSED.

New Orleans, Louisiana, this 7th day of September, 2012.

**HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**